**2021 UT App 132**

## THE UTAH COURT OF APPEALS

T.W.,
Appellant,
*v.*
S.A.,
Appellee.

Opinion
No. 20200397-CA
Filed November 26, 2021

Third District Court, West Jordan Department
The Honorable Dianna Gibson
No. 134401457

David Pedrazas, Attorney for Appellant

Laja K. M. Thompson, Attorney for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGE DAVID N. MORTENSEN and SENIOR JUDGE KATE APPLEBY
concurred.[1]

HAGEN, Judge:

¶1      T. W. (Father) appeals the district court's custody order awarding S. A. (Mother) primary physical custody of their son (Child). In so doing, the court rejected the custody evaluator's recommendation that Father be awarded primary physical custody. The court also scheduled parent-time in accordance with the minimum parent-time schedule in Utah Code section 30-3-35, as opposed to the optional increased parent-time schedule in section 30-3-35.1. Father argues each of these rulings was made in error. Because the court sufficiently supported the

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

parent-time schedule it ordered as well as its rejection of the custody evaluator's recommendation, we affirm.

BACKGROUND[2]

¶2 Father and Mother ended their relationship before Child's birth. The following year, Father petitioned for custody. Father later moved to Grantsville, Utah to live with his now-wife and her children, along with Father's other child from a prior relationship. Grantsville is approximately fifty miles from Sandy, Utah where Mother resides.

¶3 Shortly after his move, Father requested a custody evaluation. The court-appointed custody evaluator initially recommended Mother be awarded primary physical custody, but at a trial on that issue, the parties stipulated to joint legal and physical custody, with each parent enjoying alternating weeks of equal parent-time. The stipulated terms were then set forth by the court in its parentage decree. At the time, the logistics of complying with an alternating week schedule were relatively easy because Child was not yet attending school.

¶4 Around the time Child was to begin kindergarten, a dispute arose over whether Child would attend school near Mother's home in Sandy or near Father's home in Grantsville. Father moved for a temporary restraining order that would specify where Child would attend school. After a telephonic hearing, the court commissioner recommended that, for the time being, Child would attend school in Sandy pending an evidentiary hearing.

---

2. "We view the facts in the light most favorable to the trial court's findings, and therefore recite them accordingly." *Andersen v. Andersen*, 2016 UT App 182, ¶ 2 n.1, 379 P.3d 933 (cleaned up).

¶5 Child had been attending school for several months when the evidentiary hearing was held in December. After conferring with counsel off the record, the court expressed "some concerns about the workability of [Child] residing in Grantsville and going to school in Sandy or residing in Sandy and going to . . . school in Grantsville." The court reasoned that the alternating week schedule was unworkable, and the parties agreed that now that Child was in school "continuing the commute [was] not in [his] best interest." The court ultimately found that "the commute from Sandy to Grantsville is approximately 50 miles and can take approximately 50 minutes, and sometimes more, in the morning" and, "[f]or various reasons, including road/weather conditions, [Child had] been late to or missed school." Because the long commute was unworkable, the court recognized that the issue before it was "a much larger issue than just determining where [Child] goes to school"—it would require "a change in the parent-time arrangement" as well. To resolve both the parent-time arrangement and where Child would attend school in the future, the court set the matter for trial.

¶6 Before trial, the custody evaluator submitted an updated report. The evaluator recommended that Father and Mother be awarded joint legal custody but that Child's primary physical residence be with Father. The evaluator made this recommendation based on two considerations. First, he opined that Father was "in a more stable physical situation" than Mother because he owned his house and was "not likely to move," whereas Mother "rent[ed] an apartment and ha[d] a history that raise[d] concern about her ability to maintain a consistent residence." Second, he noted that Child had developed "positive and reciprocal relationship[s] with his [half-sibling and step-]siblings," who resided with Father, and Child would "attend school with them as well as receive guidance and support from them academically, socially and emotionally."

¶7 During trial, Father introduced a letter from Child's therapist explaining that Child had been diagnosed with an adjustment disorder caused by "a stressor in [his] life." That letter further stated that Child was experiencing "significant impairment in social, occupational or other areas of functioning."

¶8 Mother testified about Child's emotional and social challenges as well. She explained that Child's school counselor had been helping him to make and keep friends and to learn "what's acceptable social behavior" and "how to control [his] emotions in school." Mother testified that although Child was "struggling with focus and attention in school" as well as "emotional outbursts," he had "improved." She recounted that Child "struggled with making friends in the beginning," but was "finally making more" and by that time had friends at the school. Because Child "knows the school now" and "knows the people," Mother did not "feel that [it would be] right" to "rip [him] away from [the progress he had made] and have him start all over in a new school." Given that Child was "in therapy for adjustment disorder," she believed that "[h]aving him switch schools would just exacerbate that [condition]. He again would have to adjust to a huge change in his life."

¶9 Mother also testified about her work schedule. She described how she had started her own business so her schedule would be "flexible" for Child, that she "make[s her] own schedule," and that the reason she did this was "to be available to [Child] and his school needs and his extracurricular needs . . . so that [she could] revolve [her] work around [her] son." Mother testified that she and Child have a regular daily routine with a set schedule for school, homework, extracurricular activities, playtime, and sleep when Child is residing at her home in Sandy. Mother asserted that requiring Child to commute to school from Grantsville "probably has at least something to do with [Child's] activity in school," that "he hates [the commute],"

and that he is sometimes late to school because of "the weather" or "accidents on the freeways."

¶10  After considering the original evaluation, the updated evaluation, and the other evidence presented at trial, the court issued its custody order. It found that because of Child's "current emotional and behavioral issues which [had] been diagnosed as an Adjustment Disorder with disturbance of conduct," his "psychological and emotional" needs were the deciding factor and those needs would benefit from residing primarily with one parent. In support, the court found that Child "struggles in social settings" and has "behavioral issues," "emotional outbursts," and "difficulty making friends." Moreover, "the commute is hard on [Child]" as he was "tired in school," had "been late on several occasions," and had even "missed school" because of the long commute.

¶11  Having decided that it was in Child's best interest to reside primarily with one parent, the court ruled that it was in Child's best interest for Mother to be the primary custodial parent because Mother's testimony was "credible and persuasive" regarding the negative impact a change in school would have on Child. The court found changing schools would require Child to "start all over—start at a new school, make new friends and re-adjust," negatively affecting the progress he had made establishing friends. Moreover, Mother had the ability to provide the "maximum amount of parent-time with the maximum amount of flexibility," and Mother had "established routines in the morning, evening, and with regard to homework and playtime."

¶12  In keeping with its custody determination, the court also ruled that, "solely" because of "the 100-mile round-trip commute," the parent-time schedule of "every other week for five days in a row, was not in [Child's] best interest," and that the parent-time schedule would be altered in accordance with

Utah Code section 30-3-35—Utah's minimum parent-time schedule. The court ruled that "on alternating weekends, [Father] shall have parent-time from the time [Child's] school is regularly dismissed on Friday until Sunday at 7 p.m." Additionally, Father was awarded a mid-week overnight during which Father "pick[s] up [Child] after school, and [Mother] pick[s] up [Child] the next morning." The court explained, "The new parent-time schedule is in the best interest of [Child]" because "it allows [him] to maximize his time with [Father] while eliminating the constant, back-to-back days of commuting."

¶13   After the court filed its custody order, Father filed a motion for new trial as well as a motion to amend the court's findings. The court denied both motions. Father now appeals.

ISSUES AND STANDARDS OF REVIEW

¶14   Father challenges the district court's custody order on two grounds. First, he alleges the court failed to articulate sufficient reasons for rejecting the custody evaluator's recommendation to award him primary physical custody and that the court based its custody determination on an erroneous fact. Second, he alleges the court failed to make sufficient findings about why it did not award increased parent-time pursuant to Utah Code section 30-3-35.1.

¶15   On appeal, we review the district court's custody and parent-time determination for abuse of discretion. *LeFevre v. Mackelprang*, 2019 UT App 42, ¶ 17, 440 P.3d 874. This discretion is broad; indeed, as long as the court exercises it "within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions, we will not disturb the resulting award." *Davis v. Davis*, 749 P.2d 647, 648 (Utah 1988) (cleaned up). We review the court's "underlying factual findings for clear

error." *LeFevre*, 2019 UT App 42, ¶ 17. "A finding is clearly erroneous only if the finding is without adequate evidentiary support or induced by an erroneous view of the law." *Id.* (cleaned up).

## ANALYSIS

### I. The Rejection of the Evaluator's Recommendation

¶16 Father first challenges the district court's decision to award primary physical custody to Mother. When determining custody, the court considers many statutorily defined factors, including "the parent's demonstrated understanding of, responsiveness to, and ability to meet the developmental needs of the child, including the child's . . . physical needs; . . . emotional needs; . . . [and] any other factor the court finds relevant." Utah Code Ann. § 30-3-10(2) (LexisNexis 2019).[3] But the factors the court considers are "not on equal footing." *See Hudema v. Carpenter*, 1999 UT App 290, ¶ 26, 989 P.2d 491. "Generally, it is within the trial court's discretion to determine, based on the facts before it and within the confines set by the appellate courts, where a particular factor falls within the spectrum of relative importance and to accord each factor its appropriate weight." *Id.*

¶17 Although the district court has broad discretion to make custody determinations, it "must set forth written findings of fact and conclusions of law which specify the reasons for its custody decision." *Tucker v. Tucker*, 910 P.2d 1209, 1215 (Utah 1996). The findings "must be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the

---

3. We cite the current code because the relevant sections of the statute are not materially different from those in effect at the time of trial.

ultimate conclusion on each factual issue was reached." *K.P.S. v. E.J.P.*, 2018 UT App 5, ¶ 27, 414 P.3d 933 (cleaned up). The district court's conclusions must demonstrate how the decree "follows logically from, and is supported by, the evidence," *Andrus v. Andrus*, 2007 UT App 291, ¶ 17, 169 P.3d 754 (cleaned up), "link[ing] the evidence presented at trial to the child's best interest and the ability of each parent to meet the child's needs" whenever "custody is contested," *K.P.S.*, 2018 UT App 5, ¶ 27.

¶18 Father contends that the court failed to "articulate sufficient reasons as to why it rejected [the custody evaluator's] recommendation[]" that Child should primarily reside with Father. "[A] district court is not bound to accept a custody evaluator's recommendation," but if it rejects such a "recommendation, the court is expected to articulate some reason for" doing so. *R.B. v. L.B.*, 2014 UT App 270, ¶ 18, 339 P.3d 137.

¶19 Here, the court sufficiently supported its rejection of the custody evaluator's recommendation. The custody evaluator recommended that the court award primary physical custody of Child to Father for two reasons: (1) Father was in "a more stable physical situation" and "not likely to move," and (2) Child had a "positive and reciprocal relationship with his siblings and [would] be able to attend school with them as well as receive guidance and support from them academically, socially and emotionally." The court found the evaluation "very helpful" but did "not agree with the ultimate recommendation."

¶20 The court based its rejection of the custody evaluator's recommendation on several factors. First, the court disagreed that Mother's rental apartment was less stable than Father's living situation because both Mother and Father had relocated multiple times in the last few years and both testified that they intended to stay in their current homes. Second, although the court agreed that keeping the siblings together "would be

beneficial" to Child, the court did not "give this factor quite the weight" that the custody evaluator did, because Child had never "lived exclusively with his siblings" and their relationship was not the same as a relationship "between siblings who have been reared together prior to the separation between the parents."

¶21    The court also detailed how physical custody with Mother would better serve Child's "psychological and emotional needs." It found that Mother had "established routines" with Child "in the morning, evening, and with regard to homework and playtime." She "lived a one[-]child-centered life" and indeed had "built her life around her son"; whereas, Father's attention was divided among several children. Mother also enjoyed "flexible" self-employment that allowed her to personally provide care for Child, whereas Father's work schedule was "less flexible" and would require surrogate care.

¶22    The court further determined that it was not in Child's best interest to change schools, which would be required if Father were awarded primary physical custody. The court emphasized the need for "consistency" and "routine" for Child, as he was exhibiting signs of being "under stress," "struggle[d] in social settings," and had "behavioral issues," "emotional outbursts," and "difficulty making friends." In light of these factors, the court determined that "making too many changes all at once" would not be in Child's best interest. Most notably, the court found Mother's "testimony credible and persuasive regarding the impact a change of school would have on [Child], given his current condition and the Adjustment Disorder diagnosis." Because Child had made significant progress "adjusting" to his current school and establishing friendships, the court found that requiring Child to "start all over—start at a new school, make new friends and re-adjust"—would "impact the progress" he had made and would not be in his best interest. Consequently, granting Father primary physical custody, which

in turn would require Child to transfer to a school in Grantsville, was not in Child's best interest.

¶23 Father contends that the court erred because it rejected the custody evaluator's "recommendation solely based on [an] 'Adjustment Disorder with disturbance of conduct' diagnosis" even though "at no[] time was there any testimony as to how [the diagnosis] affected the Child, and/or how it related to the Child's relationship with each parent." But the court did not rest its decision solely on the fact that Child had been diagnosed with adjustment disorder. Instead, it considered evidence that the disorder was caused by stress, that it manifested as behavioral and social impairments, and that introducing a change such as transferring schools would exacerbate these problems. Specifically, Father introduced a letter from Child's therapist explaining that Child had been diagnosed with adjustment disorder caused by "a stressor in [his] life" and that he experienced "significant impairment in social, occupational or other areas of functioning." Mother also gave extensive testimony regarding Child's struggles with "focus," "emotional outbursts," and "making friends," and she detailed the improvements he had made in those areas. She further testified that, in light of Child's adjustment disorder diagnosis, "having him switch schools would just exacerbate that" condition and undo the progress he had made because it would require him to "start all over."

¶24 In sum, the evidence presented at trial sufficiently supports the court's ruling that Child's best interests, i.e., his "psychological, physical, and emotional" needs, were best met by Mother being awarded primary physical custody, "outweigh[ing] the factors favoring" a custody award in favor of Father. And the court's careful evaluation of that evidence certainly "articulate[s] some reason" for rejecting the custody evaluator's recommendation. *See R.B. v. L.B.*, 2014 UT App 270, ¶ 18, 339 P.3d 137. Thus, the court acted within its discretion in

rejecting the custody evaluator's recommendation and awarding Mother primary physical custody.

## II. The Parent-Time Schedule under Utah Code Section 30-3-35

¶25   Father also contends that the district court erred because it did not adopt the optional increased parent time schedule set forth under Utah Code section 30-3-35.1 without making sufficient findings. We disagree.

¶26   "[D]istrict courts are generally afforded broad discretion to establish parent-time." *Lay v. Lay*, 2018 UT App 137, ¶ 16, 427 P.3d 1221 (cleaned up). When parents do not agree to a parent-time schedule, Utah Code section 30-3-35 prescribes a "default minimum amount" of "parent-time for the noncustodial parent," unless "'the court determines that Section 30-3-35.1 should apply' or a parent can establish 'that more or less parent-time should be awarded.'" *Id.* ¶¶ 5–6 (quoting Utah Code Ann. § 30-3-34(2) (LexisNexis Supp. 2017)); *see also* Utah Code Ann. § 30-3-35(2) (LexisNexis Supp. 2021)). Under that default minimum parent-time schedule, the noncustodial parent is entitled to time with the child on "one weekday evening and on alternating weekends, which include Friday and Saturday overnights." *Lay*, 2018 UT App 137, ¶ 6. Thus, the noncustodial parent, at minimum, enjoys "two overnights in a typical two-week period." *LeFevre v. Mackelprang*, 2019 UT App 42, ¶ 20, 440 P.3d 874.

¶27   The court "may consider" an "optional parent-time schedule" set forth in Utah Code section 30-3-35.1(1)–(2), (6), which increases parent-time from two overnights to five overnights in every two-week period "by extending weekend overnights by one night, and affording one weeknight overnight each week." *See Id.* ¶ 21; *see also* Utah Code Ann. § 30-3-35.1(6) (LexisNexis 2019). The court may adopt the optional parent-time schedule when either (a) "the parties agree" or (b) "the noncustodial parent can demonstrate the presence of at least

four factual circumstances." *LeFevre*, 2019 UT App 42, ¶ 22 (cleaned up); *see also* Utah Code Ann. § 30-3-35.1(2).

¶28 But even if either of these two prerequisites is satisfied, the district court is not obligated to adopt the increased parent-time schedule.[4] Under Utah Code section 30-3-35.1, the court "is authorized, but not required, to consider the optional increased parent-time schedule as described in the statute." *Lay*, 2018 UT App 137, ¶ 13. The statute "provides legislatively established standards for the district court to apply in evaluating whether increased parent-time is warranted, and it eliminates the need for a district court to independently fashion an increased parent-time schedule by providing a detailed schedule for the court to modify or adopt." *Id.* ¶ 16. But by providing "the district court with some guidance and tools for adopting increased parent-time schedules," the legislature did not eliminate "the court's discretion to apply those tools in the best interest of the child." *Id*. To the contrary, the statutory language plainly indicates that the adoption of the increased schedule is permissive rather than mandatory. *See id.*

¶29 Nonetheless, Father argues that once the court "considered" section 30-3-35.1, it was obligated to make findings articulating why it rejected the increased parent-time schedule suggested by the statute. In setting the parent-time schedule, the court largely adopted the minimum schedule set forth in section 30-3-35, except that it increased the weekday evening parent-time to a mid-week overnight. As a result, the only difference between the increased parent-time schedule under section 30-3-

---

4. Father contends that he and Mother stipulated "that one parent should be awarded Primary Custody with the other parent being awarded parent time pursuant to Utah Code Ann. 30-3-35.1 during the school year." Mother contests this characterization of the record.

35.1 and the schedule actually ordered is an additional weekly Sunday overnight. Father contends that "the trial court should have addressed how it was in the best interest for [Child] to be returned home on Sunday as opposed to Monday morning for school."

¶30    But Father misunderstands the statutory scheme. When parents cannot agree to a parent-time schedule, section 30-3-35 provides a presumptive minimum, but the district court still retains discretion to award more time than the statute provides. *See* Utah Code Ann. § 30-3-34(1)–(2) ("[T]he court may . . . establish a parent-time schedule" but "the parent-time schedule as provided in Section[] 30-3-35 . . . shall be considered the minimum parent-time to which the noncustodial parent and the child shall be entitled."). If the court orders more parent-time than the presumptive minimum, it may "independently fashion an increased parent-time schedule" under section 30-3-35, or it may adopt the "detailed schedule" set forth in section 30-3-35.1. *See Lay*, 2018 UT App 137, ¶ 16. In any event, in awarding parent-time, the court is simply required to "enter the reasons underlying [its] order." *See* Utah Code Ann. § 30-3-34(3). The statute does not require the court to articulate specific reasons for rejecting all other alternatives, such as an additional Sunday overnight that would necessitate another long commute to school every other Monday.

¶31    In keeping with the statutory requirements, the court entered sufficient findings to support its parent-time award under section 30-3-35. The court ordered that "[Father] shall have parent-time pursuant to the guidelines established in Utah Code Ann. § 30-3-35" and articulated its reasons for customizing that schedule to allow Father an additional mid-week overnight. The court explained that it was

> interested in maximizing [Father's] time (along with his family) with [Child]. Section 30-3-35

permits a mid-week visit. It is in [Child's] best interest to have a mid-week visit at [Father's] home. [Child] will benefit from doing homework with [Father], [his stepmother,] and his siblings. And, because it is only one day a week, the impact of the commute will be minimized. The parties can determine which day works best for them and [Child].

The court concluded that "[t]he new parent-time schedule is in the best interest of [Child]—it allows [him] to maximize his time with [Father] while eliminating the constant, back-to-back days of commuting." These findings adequately support the ordered parent-time schedule.

CONCLUSION

¶32    Custody and parent-time determinations "may frequently and of necessity require a choice between good and better." *Hogge v. Hogge*, 649 P.2d 51, 55 (Utah 1982). The broad discretion we accord the district court "stems from the reality that in some cases the court must choose one custodian from two excellent parents." *Tucker v. Tucker*, 910 P.2d 1209, 1214 (Utah 1996). That is precisely the situation the district court faced here. And "where analysis reveals that the best interests of the child would be served equally well with either parent," we cannot say the "court has abused its discretion in awarding custody to one parent over another." *See id.* at 1216. Because the district court sufficiently supported its rejection of the custody evaluator's recommendation for primary custody and articulated the reasons for the parent-time schedule it adopted, we defer to the court's sound judgment. Affirmed.

———————