2022 UT App 49

## THE UTAH COURT OF APPEALS

JAZMIN S. TWITCHELL,
Appellee,
*v.*
JOSEPH N. TWITCHELL,
Appellant.

Opinion
No. 20200546-CA
Filed April 14, 2022

First District Court, Logan Department
The Honorable Brian G. Cannell
No. 184100383

Ryan L. Holdaway and Diane Pitcher, Attorneys
for Appellant

Robert L. Neeley, Attorney for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1      Joseph N. Twitchell appeals from a divorce decree and
appurtenant findings of fact and conclusions of law, arguing that
the district court failed to consider relevant statutory factors
when forming its custody determination, awarded him less
parent-time than the statutory minimum, and erroneously
calculated his child support obligation based on an inaccurate
accounting of the income of his ex-wife, Jazmin S. Twitchell. We
find Joseph's arguments persuasive on each of these issues, and
accordingly, we remand for further proceedings.

BACKGROUND

¶2    Joseph and Jazmin[1] were married in 2016 and share one child (Child), who was born in May 2017. The parties "separated about a year after she was born." Shortly thereafter, in June 2018, Jazmin filed for divorce, citing "irreconcilable differences."

¶3    The court issued temporary orders in December 2018, awarding the parties joint legal custody of Child and designating Jazmin as the primary physical custodian, "subject to [Joseph's] right to parent-time." As to the parent-time schedule, the court directed the parties to follow the minimum schedule set out in section 30-3-35 of the Utah Code, with Joseph generally "designated as the non-custodial parent," meaning that he could exercise parent-time on alternating weekends. In addition, the temporary orders granted Joseph an additional overnight with Child "every Thursday night," with Joseph keeping Child for the weekend when it was one of his parent-time weekends and returning Child to Jazmin's care by noon on Friday when it was not.

¶4    As the case proceeded to trial, Jazmin filed her financial disclosures, dated November 7, 2019. In her disclosures, Jazmin reported her gross monthly income as $2,111. In this document, under an entry entitled "Employment Status," Jazmin listed the name of a child care center where she worked at some point. Under an entry for "Name of Employer," she listed a local private school. Jazmin also filed a supplemental disclosure, dated September 23, 2019, informing the court that she had been serving as a "houseparent" at the private school since September 1, 2019, for which she received no monetary compensation but

---

1. Because the parties share the same surname, we follow our oft-used practice of referring to them by their first names, with no disrespect intended by the apparent informality.

was provided room and board. Jazmin included a letter from a representative of the school who estimated that the value of the housing and utilities provided to Jazmin was $980 per month.

¶5 A two-day trial was held in December 2019, at which multiple witnesses testified. During Joseph's testimony, he described instances of physical and verbal altercations beginning a few months into the parties' marriage. He averred that the first time things became physical between the two was in November 2016, when stress regarding the upcoming holiday season resulted in an argument and Jazmin eventually "going after [him] with a knife," cutting his hand. Joseph also described a time in Spring 2017 when he and Jazmin were in another argument, and he "went to go give her a hug and apologize . . . and she bit [his] right arm." He then described one more instance where Jazmin told Joseph "she hated [him], over and over and over again," which prompted him to threaten leaving with Child. In response, Jazmin "slapped or hit [him] with something across the face." Joseph also presented photographs of injuries he sustained from each of these incidents, which were admitted into evidence without objection.

¶6 Several witnesses also testified as to their observations of Child's condition once she went from Jazmin's to Joseph's care. One witness testified that on multiple occasions when Joseph received Child from Jazmin, Child had "severe diaper rashes" with blistering, "yeast infections," and "bite marks on her feet," and that she was "really dehydrated" to the point of not "even having a bowel movement for a day or two after." Another witness also confirmed that Child had severe diaper rashes when she came to Joseph, to the point that Joseph had to seek care from a pediatrician, and testified that Child often "had bite marks on both her hands . . . and her feet." Joseph also produced evidence documenting incidents of what he characterizes as "assaults" from other children at a daycare while Child was in Jazmin's care.

¶7 Jazmin testified about her employment history since the parties' separation. During the marriage, Jazmin had been "a stay-at-home mom," but she started a job "within two weeks of leaving" to help provide for Child. She testified to working at a child care center from approximately July 2018 until March 2019, when she left to accept an offer to work for higher pay at another daycare center. She worked at that second center full-time until October 2019. Jazmin began serving as a houseparent at the private school in September 2019, a role she was still working in at the time of trial.

¶8 In addition to her financial disclosure in which she reported the aforementioned $2,111 figure, Jazmin also offered her 2018 tax return into evidence. That return listed only the first child care center as her employer and an annual gross income of $7,044.75—which would translate to approximately $587 per month. Jazmin nevertheless confirmed at trial that her gross monthly income was $2,100. When asked if that amount included the $980 value of her housing and utilities, she stated, "No. That . . . doesn't have anything to do with that." When asked about her current employment, she testified that she had just started working as a substitute teacher earning $75 per day, which she "guesstimate[d]" she did two to three days per week. Based on that "guesstimate," Jazmin testified that she earned approximately $813 per month from substitute teaching as opposed to the $2,100 in her financial declaration. Jazmin also confirmed that, at the time of trial, she had no sources of income other than her "service as a houseparent, [and her] income from substitute teaching."

¶9 Later, on cross-examination, when asked about the $2,111 reported as her gross monthly income in her disclosure, Jazmin admitted that there was actually "no documentation being provided with that [disclosure] that would substantiate that number." While Jazmin was being cross-examined, the court interjected and expressed its confusion as to whether the $980

value of her housing expenses had been included in her reported monthly income; although Jazmin never answered the court directly, her attorney asserted that it was included within that amount (contradicting Jazmin's earlier testimony in which she had stated the opposite). Jazmin also stated that at the time of trial, she had actually worked as a substitute teacher on only one occasion up to that point.

¶10 Testimony was also given by a representative of the private school, whom Jazmin had contacted to secure documentation of the value of her housing and utilities. A final draft of a letter from the representative was attached to Jazmin's supplemental disclosure. But at trial, Joseph offered evidence of an earlier draft of the letter in which the representative had originally stated that the value of what Jazmin received was estimated at $1,800 per month for rent and $1,000 per month for utilities, whereas the amount given in the final letter was $980 for both rent and utilities. The representative testified that she had sent the initial draft to Jazmin's grandmother asking if it was "acceptable," and either Jazmin or her grandmother had then asked additional questions about the square footage and what portion of the house Jazmin was actually living in, and whether that was reflected in the amount the representative gave. This prompted the representative to change the amount to $980 in the final letter, based on a "pro-rated amount" that seemed more consistent with the part of the house where Jazmin was living.

¶11 The court issued findings of fact and conclusions of law in April 2020.[2] While it awarded the parties joint legal custody of

---

2. Other than mentioning that "both parent[s] can step up and be good parents and both parents in large part have been good parents," the court did not announce a ruling from the bench at the conclusion of the trial. Instead, it asked both parties to

(continued…)

Child, it also found that it was in Child's "best interest" that Jazmin be awarded primary physical custody. In support, the court cited the following findings: Jazmin had primary physical custody of Child since the parties separated, and the parties had been "following" the parent-time schedule imposed by the court in its temporary orders, consisting of "alternating weekends, with [Joseph] being awarded overnight every Thursday"; Child was "happy and well[-]adjusted and [was] progressing well developmentally"; Child was "closely bonded to [Jazmin] as she ha[d] been the primary custodial parent since birth, while [Joseph] was the primary bread winner in the family"; it was in Child's "best interest . . . to maintain a close relationship with her half sister," of whom Jazmin has primary physical custody; Jazmin had "exhibited good parenting skills" and was "of good moral character, and emotionally stable"; Jazmin had "exhibited a depth and desire for custody of [Child] since . . . birth"; Jazmin had "a flexible work and school schedule and she ha[d] the ability to provide personal care rather than surrogate care"; Jazmin had experience in early childhood education; and Jazmin "exhibited sound financial responsibility" whereas the court was

---

(…continued)

prepare proposed findings of fact and conclusions of law and heard closing arguments at a subsequent hearing. Ultimately, with only a few minor alterations, the court adopted Jazmin's findings of fact and conclusions of law in their entirety.

While we would not go so far as to say that it is inappropriate for the court to fully adopt one party's proposed findings, before signing off the court should confirm that those findings conform to the evidence presented at trial and that the findings sufficiently explain the court's reasoning for the decision. In this case, it appears that the court adopted Jazmin's version of the evidence without confirmation of that evidence and without disclosing the steps by which the ultimate conclusion on each factual issue was reached.

"concerned about [Joseph's] lack of financial responsibility" based on his debt accumulations. In the findings, the court also expressed its "concern[] about the alleged physical abuse between the parties during the marriage" and therefore found it "appropriate" for the exchanges of Child to occur at a police department safe zone located roughly halfway between the parties' homes.

¶12   The court additionally noted its consideration of the factors outlined in section 30-3-10.2 of the Utah Code, finding in particular that Child's "physical, psychological, emotional and development needs will benefit from the parties sharing joint legal custody." But the court listed several reasons under these factors why joint physical custody would not be appropriate, finding that the "parties do not effectively communicate with each other"; they lived "approximately 60 miles" apart; Joseph "participated in raising [Child] but not to the extent that [Jazmin] did"; "[t]o date there ha[d] not been . . . opportunities for either parent to protect [Child] from any conflict that may arise between the parties, due to [Child's] age"; and "the parties' relationship ha[d] stabilized and once these divorce proceedings have concluded it is anticipated the parties will be able to cooperate with each other and make appropriate joint decisions regarding [Child]."

¶13   As to parent-time, the court concluded that Joseph's parent-time "shall be, until [Child] starts Kindergarten, every Thursday overnight and every other weekend from Friday (after school) to Sunday evening at 6 p.m." And on weeks that ended with Jazmin's designated weekend, Joseph "shall return [Child] to [Jazmin] by Friday at noon, after his Thursday overnight visit." The court also concluded that "[t]he parties shall follow the holiday parent time pursuant to Utah Code Ann. § 30-3-35" but that Joseph "shall be awarded six[ ]weeks of extended summer vacation instead of four[ ]weeks, consistent with Utah

Code Ann. § 30-3-35 and by stipulation of [Jazmin] at closing arguments."

¶14 Regarding child support, the court found that Jazmin "earn[ed] $980 per month gross wage from her house parent job" and "approximately $780 per month" from substitute teaching. It therefore calculated her gross monthly income at $1,760 for child support purposes. The court then found that Joseph's average gross income is $5,011 per month, and therefore his "child support obligation is $582 per month."

¶15 The court entered a decree of divorce in June 2020, in which it largely echoed the parent-time findings, ordering that Joseph's parent-time "shall be every Thursday overnight and every other weekend from Friday (after school) to Sunday evening at 6 p.m. On [Jazmin's] weekend with the parties' child, [Joseph] shall return [Child] to [Jazmin] by Friday at noon following his Thursday overnight parent time." And once Child "commences Kindergarten [Joseph's] parent time shall change[] to every other weekend from Friday (after school) to Sunday at 6 p.m., and a mid-week from after school until 7 p.m." The decree did not mention a schedule for holidays or extended/vacation parent-time. The decree also reiterated what the court found to be the parties' respective incomes, and accordingly it memorialized its decision ordering Joseph to pay $582 per month in child support.

¶16 Joseph promptly appealed the findings of fact and conclusions of law, as well as the divorce decree.

ISSUES AND STANDARDS OF REVIEW

¶17 On appeal, Joseph presents two main issues for our consideration. First, he attacks the district court's custody determination on two bases, arguing that the court's custody conclusion and the underlying factual findings are deficient

because it failed to consider certain relevant factors and that the court erred in awarding him less than the minimum time provided by statute without explaining a reason to depart from the statutory minimum. "[W]e review the district court's custody and parent-time determination for abuse of discretion." *T.W. v. S.A.*, 2021 UT App 132, ¶ 15, 504 P.3d 163. "This discretion is broad; indeed, as long as the court exercises it within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions, we will not disturb the resulting award." *Id.* (quotation simplified).

¶18 Second, Joseph challenges the district court's child support determination, asserting that it made errors in calculating Jazmin's income, resulting in an inaccurate child support obligation.[3] "In reviewing child support proceedings, we accord substantial deference to the [district] court's findings and give it considerable latitude in fashioning the appropriate relief. We will not disturb that court's actions unless the evidence clearly preponderates to the contrary or there has been an abuse of discretion." *Hibbens v. Hibbens*, 2015 UT App 278, ¶ 17, 363 P.3d 524 (quotation simplified).

---

3. As part of his broader challenge to the district court's child support determination, Joseph purports to include another argument: that the court erred in dividing the parties' debts. However, Jazmin points out that while Joseph included this argument in his articulation of the issues on appeal, he "did not [substantively] address the debt issue in his brief." Indeed, we find a dearth of any argument regarding the debt distribution in Joseph's brief; accordingly, Joseph has failed to properly raise such an argument for our consideration.

ANALYSIS

I. Custody and Parent-Time

A.      Consideration of the Relevant Factors

¶19    Joseph first asserts that the district court erred by failing to adequately consider certain statutory factors in formulating its custody determination. Specifically, he asserts that two factors did not receive the attention he feels they deserved by the district court, namely, any "evidence of domestic violence, neglect, physical abuse, sexual abuse, or emotional abuse, involving the child, the parent, or a household member of the parent" and "the past conduct and demonstrated moral character of the parent." *See* Utah Code Ann. § 30-3-10(2)(a), (d) (LexisNexis 2019). We agree with Joseph that it is not clear from the district court's findings that it considered evidence regarding abusive behavior by Jazmin, neglect and injuries to Child, or Jazmin's moral character. Accordingly, we remand for the court to fully evaluate that evidence through supplemented or additional findings.

¶20    "In all custody determinations, the district court's primary focus must be on the best interests of the child." *Pingree v. Pingree*, 2015 UT App 302, ¶ 7, 365 P.3d 713 (quotation simplified). Furthermore, when "determining any form of custody and parent-time" arrangement, the district court "shall consider the best interest of the child and may consider [any] factors the court finds relevant" to that end, including certain factors that are specifically articulated in the Utah Code. *See* Utah Code Ann. § 30-3-10(2). Importantly, not all these factors are "on equal footing"; instead, the district court generally has "discretion to determine, based on the facts before it and within the confines set by the appellate courts, where a particular factor falls within the spectrum of relative importance and to accord

each factor its appropriate weight." *T.W. v. S.A.*, 2021 UT App 132, ¶ 16, 504 P.3d 163 (quotation simplified).

¶21 Determining which factors the court must address in a given case, and to what degree, presents a tricky task. Inevitably, some factors will loom larger in a given case than other factors, and "[t]here is no definitive checklist of factors to be used for determining custody." *Sukin v. Sukin*, 842 P.2d 922, 924 (Utah Ct. App. 1992). Consequently, "courts are not required to render a global accounting of all evidence presented or to discuss all aspects of a case that might support a contrary ruling." *Shuman v. Shuman*, 2017 UT App 192, ¶ 6, 406 P.3d 258. On the other hand, a "court's factual findings are adequate only if they are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Lay v. Lay*, 2018 UT App 137, ¶ 19, 427 P.3d 1221 (quotation simplified). And where significant evidence concerning a particular factor is presented to the district court, findings that omit all discussion of that evidence must be deemed inadequate. *See Barnes v. Barnes*, 857 P.2d 257, 261 (Utah Ct. App. 1993) ("The record is replete with highly disputed evidence relevant to the custody issue which is not dealt with at all in the findings. The findings do not show whether the court considered the moral conduct or emotional stability of the parties and what evidence the court found determinative in deciding the best interests of the children."); *Sukin*, 842 P.2d at 925 ("Whenever custody is contested and evidence presents several possible interpretations, a bare conclusory recitation of factors and statutory terms will not suffice. We must have the necessary supporting factual findings linking those factors to the children's best interests and each parent's abilities to meet the children's needs." (quotation simplified)).

¶22 Joseph asserts that the district court failed to consider evidence presented at trial of domestic violence Jazmin had

perpetrated against him as well as neglectful behavior Jazmin had purportedly inflicted on Child. Specifically, Joseph points to his own testimony at trial that Jazmin had slapped him in the face hard enough to leave red marks, had attempted to stab him with a pocket knife, and had bitten him. Joseph also presented photographic exhibits purporting to show his injuries from these incidents. Joseph also points to testimony at trial and an exhibit he introduced into evidence tending to show injuries that Child sustained while she was in Jazmin's care. One witness testified that when Joseph received Child from Jazmin, Child often had "severe diaper rashes" with blistering, "yeast infections," and "bite marks on her feet," and that she was "really dehydrated" to the point of not "even having a bowel movement for a day or two after." Another witness also confirmed that Child had severe diaper rashes when she came to Joseph, such that Joseph had to seek care from a pediatrician, and testified that Child often "had bite marks on both her hands . . . and her feet." Finally, Joseph asserts that the court did "not analyze or even mention . . . multiple incidents" in which Jazmin supposedly "engaged in deceitful tactics" during the litigation. Specifically, Joseph asserts that Jazmin instructed a witness on what to testify regarding Jazmin's income from her houseparent job, that Jazmin and another witness mischaracterized the events that precipitated an incident when the police were called around the time of the parties' separation, that Jazmin claimed that the parties were married on a date different from that indicated on their marriage certificate, and that Jazmin supposedly attempted to manipulate the testimony of her ex-husband in the case.

¶23 With respect to "evidence of domestic violence, neglect, physical abuse, sexual abuse, or emotional abuse, involving the child, the parent, or a household member of the parent" and "the past conduct and demonstrated moral character of the parent," *see* Utah Code Ann. § 30-3-10(2)(a), (d), the court made only the following finding: "[Jazmin] has exhibited good parenting skills, is of good moral character, and emotionally stable." It then

proceeded to emphasize the facts it believed supported Jazmin's bid for custody: that Jazmin had been Child's primary caretaker; that Child had a bond with Jazmin's other child, her half-sister; that Jazmin had made sure Joseph received his parent-time in accordance with the temporary orders; that Jazmin had "a depth and desire for custody"; that Jazmin had a flexible schedule that would allow her to provide personal care for Child; that Jazmin had taken Child to her medical appointments; and that Jazmin was financially responsible, "industrious," and "goal oriented." The court made no findings regarding Joseph's parenting abilities, past conduct, bond with Child, etc., except to express concern that he was in debt.[4] Finally, the court stated that it was "concerned about the alleged physical abuse between the parties" and concluded it was therefore appropriate for them to exchange Child at a police department safe zone.

¶24 "To ensure that the trial court's custody determination, discretionary as it is, is rationally based, it is essential that the court set forth in its findings of fact not only that it finds one

---

4. We are troubled by the manner in which the district court's findings focused exclusively on Jazmin rather than comparing hers and Joseph's relative character, skills, and abilities. *See Woodward v. LaFranca*, 2013 UT App 147, ¶¶ 22, 26–28, 305 P.3d 181 (explaining that a court's findings must "compare the parenting skills, character, and abilities of both parents" and reversing a finding that the emotional stability factor weighed in favor of mother because it was based solely on the determination that mother was emotionally stable without any findings regarding father's emotional stability; "the question for the court was not whether Mother was emotionally stable, but whether Mother was more emotionally stable than Father" (quotation simplified)), *abrogated on other grounds by Zavala v. Zavala*, 2016 UT App 6, 366 P.3d 422. We urge the court on remand to make the appropriate comparisons in revising its findings.

parent to be the better person to care for the child, but also the basic facts which show why that ultimate conclusion is justified." *Sukin*, 842 P.2d at 924 (quotation simplified). The court's finding that Jazmin "has exhibited good parenting skills, is of good moral character, and emotionally stable" is inadequate for us to determine whether the court exceeded its discretion in assessing the abuse/neglect and moral character factors or how those factors impacted Child's best interests. Likewise, the court's expression of "concern[] about the alleged physical abuse between the parties during the marriage" tells us nothing about how or even if the court weighed the abuse allegations in its custody evaluation. Indeed, it is not clear to us that the court considered this factor at all in assessing which parent should be awarded custody, as it mentioned the factor only in the context of concluding that it would be "appropriate" for the exchanges of Child to occur at a police department safe zone. Without at least some discussion of the evidence the court relied on in assessing the factors and how the court related the factors to Child's best interests, the court's findings regarding the custody factors are inadequate. *See, e.g.*, *K.P.S. v. E.J.P.*, 2018 UT App 5, ¶¶ 30–42, 414 P.3d 933 (determining that the court's factual findings were inadequate where it made factual conclusions but did not discuss the evidence underlying those conclusions and rejected the guardian ad litem's recommendation without explanation); *Bartlett v. Bartlett*, 2015 UT App 2, ¶ 6, 342 P.3d 296 (rejecting the court's conclusory finding that the mother was "better able and equipped to support and sustain a positive relationship between the children and their father" where the "court identified no subsidiary facts supporting this finding" and had, in fact, "admonished Mother for denying Father court-ordered access to the children" (quotation simplified)); *Barnes*, 857 P.2d at 261 (rejecting as inadequate the court's finding that "[t]he Plaintiff's level of commitment to her children during the course of this separation has exceeded that of the Defendant and that's been established by their actions during the course of their separation" because "[t]he findings do not show whether the

court considered the moral conduct or emotional stability of the parties and what evidence the court found determinative in deciding the best interests of the children"); *Roberts v. Roberts*, 835 P.2d 193, 196–97 (Utah Ct. App. 1992) (deeming inadequate findings that "Husband has physically abused Wife during the marriage" and that "both parties have participated in acts that bear on their moral character," accompanied by a recitation of examples of each party's bad behavior because the recitation did not give any "guidance regarding how those acts bear on the parties' parenting abilities or affect the children's best interests" (quotation simplified)); *Cummings v. Cummings*, 821 P.2d 472, 478–79 (Utah Ct. App. 1991) (reversing the district court's custody determination based on its failure to make findings regarding evidence relating to important custody factors); *Paryzek v. Paryzek*, 776 P.2d 78, 83 (Utah Ct. App. 1989) (holding that it was an abuse of discretion for the court's findings to "omit any reference" to a custody evaluation and evidence relating to the bond between father and son, the father's status as primary caretaker pending trial, the fact that the child thrived while in the father's care, and the son's preference for living with his father).

¶25 Thus, we conclude that the district court exceeded its discretion by failing to include in its findings any discussion of the evidence relating to the abuse allegations against Jazmin, her alleged neglect of Child, and her moral character, as well as the effect that evidence had on its best-interest analysis. Accordingly, we vacate the district court's custody and parent-time order and remand for the court to revisit that evidence and enter additional or supplemented findings, as necessary.

B.    Deviation from Statutory Minimum Parent-Time Schedule

¶26 Joseph next argues that the district court committed reversible error by awarding him less than the minimum parent-time he is guaranteed by statute. Because we agree that the

court's custody award indeed creates a situation in which Joseph is guaranteed less than the statutory minimum, without explaining its reasoning in adequate factual findings, we conclude that this is an additional reason to vacate the court's parent-time order.

¶27   In the event that the parents of a minor child litigating that child's custody are unable to agree to a parent-time schedule, our legislature has codified a "minimum parent-time [schedule] to which the noncustodial parent and the child shall be entitled." *See* Utah Code Ann. §§ 30-3-35(2), 30-3-35.5(3) (LexisNexis 2019 & Supp. 2021). In fashioning its parent-time order, the court may either "incorporate[] a parent-time schedule provided in Section 30-3-35 or 30-3-35.5; or . . . provide[] more or less parent-time" than outlined in those sections, but in either case "[t]he court shall enter the reasons underlying the court's order for parent-time." *Id.* § 30-3-34(4) (Supp. 2021). The court's reasoning must be outlined in adequate factual findings, which must "contain sufficient detail to permit appellate review to ensure that the district court's discretionary determination was rationally based." *Lay v. Lay*, 2018 UT App 137, ¶ 19, 427 P.3d 1221 (quotation simplified). Thus, the statutory minimum "provides [the court with] a presumptive minimum, but the district court still retains discretion to award more [or less] time" to the noncustodial parent, so long as it identifies "the reasons underlying its order" in sufficiently detailed factual findings. *See T.W. v. S.A.*, 2021 UT App 132, ¶ 30, 504 P.3d 163 (quotation simplified).

¶28   There is a separate section dealing with the minimum schedule for children who are under five years of age, *see* Utah Code Ann. § 30-3-35.5 (2019), and those who are between five and eighteen years of age, *see id.* § 30-3-35 (Supp. 2021). As Child was born in May 2017, she is still currently younger than five, so section 30-3-35.5 applies. Under that section, Joseph is entitled to "one weekday evening between 5:30 p.m. and 8:30 p.m.,"

"alternative weekends . . . from 6 p.m. on Friday until 7 p.m. on Sunday," certain holidays, and "two two-week periods, separated by at least four weeks, at the option of the noncustodial parent." *See id.* § 30-3-35.5(3)(f) (2019).

¶29 Under the court's findings and the divorce decree, Joseph receives parent-time "every Thursday overnight and every other weekend from Friday (after school) to Sunday evening at 6 p.m.," and when it is Jazmin's weekend, he returns Child to Jazmin "by Friday at noon following his Thursday overnight parent time." Although Joseph correctly points out that the parent-time order requires him to return Child one hour earlier on Sundays than provided for in the statutory minimum schedule, Joseph ultimately receives more than the minimum parent-time required by statute while Child is under five, because he receives an additional weekday overnight, whereas the statute requires only a weekday evening visit. *See id.* Thus, for the time being, Joseph receives more than the statutory minimum.

¶30 But the situation changes when Child starts school. The district court ordered that once Child "commences Kindergarten," Joseph's parent-time "shall change[] to every other weekend from Friday (after school) to Sunday at 6 p.m., and a mid-week from after school until 7 p.m." This schedule deviates from the statutory minimum, under which Joseph is entitled to "[a]lternating weekends . . . from 6 p.m. on Friday until Sunday at *7 p.m.*," and one weekday evening from either "5:30 p.m. until *8:30 p.m.*" or, "at the election of the noncustodial parent, one weekday from the time the child's school is regularly dismissed until *8:30 p.m.*" *Id.* § 30-3-35(2)(a)(i), (2)(b)(i)(A) (Supp. 2021) (emphases added). Thus, under the court's parent-time order, once Child begins kindergarten Joseph is required to return her to Jazmin one hour early on his weekends and one-and-a-half hours early during his weekday evenings.

¶31 As Joseph convincingly points out, while these discrepancies "may seem minor" to a casual observer, for "the non-custodial parent on a minimum visitation schedule, hours matter." And, more importantly, the court did not explain—or even acknowledge—that it was departing from the statutory minimum. While section 30-3-35 is referenced in the findings of fact with respect to Joseph's parent-time for holidays and summer vacation, the court made no other mention of the statutory minimum schedule.[5] As noted, when making its custody decision the court must give the "reasons underlying" its decision. *See id.* § 30-3-34(4); *T.W.*, 2021 UT App 132, ¶ 30. The court did depart from the statutory minimum in this case, and it gave no reason for doing so in its findings.

¶32 As a result, we are prevented from conducting meaningful "appellate review to ensure that the district court's discretionary determination was rationally based." *See Lay*, 2018 UT App 137, ¶ 19 (quotation simplified). Accordingly, the findings in support of the district court's parent-time order are insufficient, leaving us with no choice but to remand the matter for the court to adopt the statutory minimum schedule or otherwise explain its reasoning for departing from the minimum through adequate factual findings. *See id.*

## II. Child Support

¶33 Joseph next challenges the district court's child support determination, arguing that its determination of Jazmin's income was entirely unsupported by the evidence and insufficiently explained. Because we agree that the court did not sufficiently

---

5. Furthermore, section 30-3-35.5 is not referenced at all, which would have been the operative section from the time the decree was entered until Child turns five.

explain how it reached the number it did in calculating Jazmin's monthly income, we remand for entry of additional findings.

¶34 "A noncustodial parent's child support obligation is calculated using each parent's adjusted gross income." *Barrani v. Barrani*, 2014 UT App 204, ¶ 11, 334 P.3d 994. Each parent's "gross income" for purposes of child support "includes prospective income from any source, including earned and nonearned income sources which may include salaries, wages, . . . [and] rents." Utah Code Ann. § 78B-12-203(1) (LexisNexis 2018). "Income from earned income sources is limited to the equivalent of one full-time 40-hour job." *Id.* § 78B-12-203(2). "[C]hild support is appropriately calculated based on earnings at the time of trial," but district courts also "have broad discretion to select an appropriate method" of calculating each parent's income. *Griffith v. Griffith*, 959 P.2d 1015, 1019 (Utah Ct. App. 1998).

¶35 In this case, there were a number of potential bases for the court to assess Jazmin's income. First, it could have accepted the declared full-time income in her financial declaration of $2,100, which she initially reaffirmed at trial. Second, it could have used her part-time substitute teaching income of approximately $813 per month combined with her in-kind income of $980 per month to reach a monthly income of $1,793. Third, it could have imputed her full-time income based on her substitute teaching salary of $75 per day for a total of $1,625 per month. There may, perhaps, have been other methods the court could have employed as well, had it adequately explained its reasoning.

¶36 Generally, "so long as the steps by which the ultimate conclusion on each factual issue was reached are apparent, a trial court may make findings, credibility determinations, or other assessments without detailing its justification for finding particular evidence more credible or persuasive than other evidence supporting a different outcome." *Shuman v. Shuman*,

2017 UT App 192, ¶ 6, 406 P.3d 258 (quotation simplified). And had the court taken one of the approaches outlined above, or another approach for which its reasoning was apparent, we would be inclined to affirm the court's decision.[6] However, here the district court's finding that Jazmin earned "approximately $780 per month" from substitute teaching does not align with any evidence submitted at trial, nor, so far as we can tell, can it be extrapolated from that evidence.[7] As Joseph observes, this number "do[es] not appear to come from the documentary or testimonial evidence at all." Jazmin testified that she earned $75 per day working as a substitute teacher but that she worked only

---

6. While a finding that aligned with the various numbers presented at trial would have met the bare minimum threshold for sufficiency, we note that this case would substantially benefit from further analysis. First, the court did not address the inconsistencies in Jazmin's trial testimony regarding her income. Jazmin first agreed that the $2,111 monthly income in her financial declaration was accurate but then went on to testify that she made only $75 per day substitute teaching and worked only two to three days per week. But the court did not address or explain the reasoning behind its resolution of this inconsistency. Second, Joseph presented evidence that Jazmin's housing and utilities had been undervalued. The court's decision included no discussion of the conflicting evidence regarding the value of Jazmin's in-kind earnings or its assessment of that conflicting evidence. On remand, the court's findings could benefit from a more thorough discussion of the evidence and explanation for its resolution of these conflicts.

7. In Jazmin's post-trial brief, she stated, without any supporting evidence, that she earned $72 per day, for a total of $780 per month. This appears to be the source of the court's number. As assertions in the post-trial brief are not evidence, the court could not rely on this number to calculate child support.

two to three days a week. Using these numbers, she reached a "guesstimate" of her monthly income of $813 per month ($75 per day x 2.5 days per week x 52 weeks per year / 12 months). While Jazmin was admittedly unsure about the amount she would be able to earn, the $780 figure adopted by the court appears to not be supported by the evidence presented at trial. While we are reluctant to reverse a district court's child support order on this basis considering the small discrepancy between the $813 and $780 figures, the fact remains that we are unable to identify the "steps by which the ultimate conclusion on [this] factual issue was reached." *See id.* (quotation simplified).

¶37 In such situations, "without the benefit of the reasoning and additional findings by the [district] court," we must remand the child support decision to the district court to detail its full reasoning, through adequate findings, for why it chose the income amount for Jazmin that it did. *See Bell v. Bell*, 2013 UT App 248, ¶ 19, 312 P.3d 951.

CONCLUSION

¶38 This appeal compels us to remand the case because the district court's findings and conclusions were infirm in several respects. First, the court failed to address disputed evidence that was highly relevant to the court's custody determination. Second, the court's order awards Joseph less than the statutory minimum parent-time once Child starts kindergarten, without explaining why or recognizing that it did so. And third, the court's findings regarding Jazmin's income contain insufficient detail for us to adequately review its reasoning.

———————