2023 UT App 50

# THE UTAH COURT OF APPEALS

SHAUN ROBERT ROTHWELL,
Appellant,
*v.*
JENEA ROTHWELL,
Appellee.

Opinion
No. 20210493-CA
Filed May 11, 2023

Fourth District Court, Provo Department
The Honorable Darold J. McDade
No. 184401412

Aaron R. Harris, Thomas J. Burns, Stephanie L.
O'Brien, and Lacee M. Whimpey,
Attorneys for Appellant

Julie J. Nelson, Mitchell J. Olsen Sr., and Mitchell J.
Olsen Jr., Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     In June 2018, Shaun Robert Rothwell commenced a divorce action against his wife, Jenea Rothwell. Among other things, the district court was tasked with dividing substantial assets and calculating an appropriate award of alimony to Jenea. On appeal, we are asked to review numerous rulings of the district court, including its decision to substantially adopt Jenea's proposed findings of fact and conclusions of law, its valuation and division of various assets, its calculation of Jenea's needs and income for alimony purposes, and its inclusion of attorney fees in Jenea's alimony award. Because we conclude that there was no evidence supporting Jenea's claimed expense for her adult children and

that the court should not have included attorney fees in its calculation of Jenea's needs for alimony purposes, we reverse the district court's findings that those two expenses should be considered for purposes of alimony. We remand for the district court to analyze Jenea's request for attorney fees under the appropriate rubric and to reduce its alimony award by $3,800 per month so as not to reflect Jenea's claimed needs for her adult children expense and her attorney fees. We affirm the district court's ruling in all other respects.

## BACKGROUND

¶2 Jenea and Shaun married in 1992 and had four children together, all of whom are now adults.[1] During the parties' marriage, Jenea "stayed home and cared for the children and other home-related duties" while Shaun worked outside the home to support the family. In 2008, Shaun founded iDrive Logistics (Logistics) and iDrive Supply Chain Solutions (SCS). These businesses were very successful and allowed the parties a very "comfortable and affluent lifestyle." In June 2018, Shaun filed for divorce.

¶3 To help them resolve issues relating to division of the marital property and the parties' standard of living, the parties engaged a joint expert, Brad Townsend. Shaun subsequently hired additional experts, including Daniel Rondeau, to provide opinions on those issues.

¶4 Townsend provided estimated values of Logistics and SCS as of June 2018 and February 2019. In reaching these estimates, he reviewed the companies' financial statements and tax returns, examined the marketplace and the economy in general, looked at

---

1. The youngest child was a minor when the divorce was finalized but became an adult soon after. The parties stipulated to custody and parent-time, and those matters are not at issue on appeal.

industry data, spoke to Shaun, and interviewed Logistics' controller, Chantale Smith. He opined that the value of Logistics was $11,882,550 in 2018 and $13,840,775 in 2019 and that the value of SCS was $3,776,775 in 2018 and $930,550 in 2019.

¶5    Townsend further opined that the marital value of Logistics should be reduced proportionate to Shaun's personal goodwill, which he calculated to be 37.87%.[2] He calculated this number "primarily based on [his] understanding of how the company acquires contracts for its consulting business" and Shaun and Smith's "explanation of [Shaun's] role . . . in obtaining those contracts." However, he indicated that if there were other individuals at the company who had key roles in obtaining contracts, that fact would "temper[]" his assessment of Shaun's goodwill.

¶6    Smith testified that Logistics' president and vice president also secured consulting contracts. Shaun testified that the president and he "work together" to secure contracts with new clients and that the vice president also works on securing contracts, but that the vice president does not do so alone and that he mostly works on renewals. The vice president testified that he works with Shaun and the president to "close" deals.

¶7    Townsend explained that the value of SCS decreased between June 2018 and February 2019 because its "revenues and profits plummeted," with its revenue declining by approximately $40 million between 2018 and 2019. Townsend testified that he used "a projection" provided to him by Smith as "a primary information source" for completing the February 2019 valuation of SCS. The projection indicated that "the company was going to lose money going forward" over the next several years. He also

---

2. Applying this percentage would have reduced the estimated marital value of Logistics to $8,587,350 in 2018 and $9,996,875 in 2019.

testified that Smith's projections would be impeached if it turned out that "Shaun's distributions from 2018 to 2019 increased." Shaun's tax returns showed that his distributions from SCS increased from $617,425 in 2018 to $791,699 in 2019, and that his Logistics distributions increased from $3,532,396 in 2018 to $8,656,850 in 2019.

¶8     When asked whether the 2018 or the 2019 valuation of the two businesses was "a more reliable indicator of [each] company's value" at the time of trial, Townsend answered that "the more recent one would be the better indicator" but that he was not sure "how reliable either one would be as far as the value today" and that "they may be good indicators of the value today or they may not" because he did not "know what's happened in the last two years."

¶9     Rondeau also assessed the value of the companies. He agreed that Townsend's assessment of Shaun's personal goodwill was "reasonable." However, unlike Townsend, Rondeau "tax affected" the businesses by deducting from their value the amount Shaun could expect to pay in taxes if he sold them. After taking into account Shaun's goodwill and the anticipated taxes, Rondeau opined that the marital value of Logistics was $6,835,569 and the marital value of SCS was $860,692.

¶10     The parties and their experts also provided extensive evidence regarding the parties' marital property and its value. Relevant to this appeal, this evidence included information regarding a home Shaun purchased in Heber, Utah, while the divorce was pending (the Heber Home), unaccounted-for marital funds, the parties' 2019 tax return, and several of the parties' vehicles.

¶11     The purchase price of the Heber Home was approximately $6 million. Shaun paid $1.5 million as a down payment on the home, which he testified came from a loan provided by Logistics. The remainder of the home was financed by a mortgage on which

Shaun had been making payments of $20,000 per month since October 2020. Shaun testified that the loan from Logistics was secured by a promissory note "with a fair market interest rate" and that he would eventually pay that money "back into the business." However, Shaun did not produce the promissory note for the court.

¶12 Townsend indicated in his report that he had been unable to account for several withdrawals totaling $481,741.73 that Shaun had made from a marital account. When Townsend inquired about the funds, Shaun provided documentation that two of the withdrawals—in the amounts of $250,000 and $220,988.66—matched equivalent transfers to the account from an Ameritrade account belonging to the parties. The parties had previously stipulated to divide $700,000 from the Ameritrade account, with each receiving $350,000 as separate property.

¶13 The parties filed joint tax returns in 2018 and 2019. The parties had overpaid taxes in 2018 and applied the overpayment to their 2019 taxes. They again had an overpayment in 2019 in the amount of $668,444, which Shaun instructed the IRS to apply to his 2020 taxes. Shaun testified that, historically, he had applied any tax overpayments to taxes for the next quarter. Jenea argued that the 2019 tax refund was marital property that should be divided between the parties, whereas Shaun argued that it should be applied to his next year's taxes, consistent with the parties' practice during the marriage. The court had entered a bifurcated decree in May 2020, so the parties would be unable to file a joint tax return for 2020.

¶14 The parties owned numerous vehicles.[3] These included a 2020 Mercedes Benz G Wagon and several trucks, including a

---

3. We refer to the vehicles by the names the parties and the court used at trial and in the divorce decree, acknowledging that these may not be consistent with how these vehicles are marketed.

2019 King Ranch. The Mercedes was purchased by Shaun and was in his possession at the time of trial. Shaun purchased the King Ranch truck for one of the parties' children. He testified that he "traded [his] truck in" and spent an additional $12,000 to $15,000 to purchase the King Ranch truck, but he could not recall the value of the trade-in. He also did not identify the truck he traded in to purchase the King Ranch truck.

¶15 In addition to their disputes regarding property division, the parties disputed how much Shaun should pay to Jenea in alimony. As part of his report, Townsend provided a breakdown of the parties' spending between January 1, 2016, and December 31, 2018. He then used those amounts to estimate what each party would need to maintain the marital standard of living going forward. Jenea also provided the district court with a financial declaration concerning her needs.[4] The financial declaration was entered as an exhibit, and Jenea confirmed that it accurately reflected her expenses. Some of her calculations were in line with Townsend's estimates, and some were not. As relevant to this appeal, the estimates concerned educational and religious mission expenses for the parties' adult children, as well as expenses for real estate maintenance, yard care, house cleaning, pool services, real estate insurance, telephone, gifts, dining out, entertainment, and attorney fees.

¶16 In her financial declaration, Jenea asserted a need for $300 per month for "Adult College Aged Child" expenses and $450 per month for "Adult Child Mission." Evidence at trial indicated that the parties had a practice of supporting their adult children's educational expenses and paying for the cost of religious missions they had served on behalf of their church. At the time of trial,

---

4. Jenea actually submitted several financial declarations in the course of the proceedings, but the final updated declaration was the one on which the district court relied for its findings and the one to which we refer throughout this opinion.

Shaun was paying the adult children's educational expenses, and Jenea was paying for one child's mission expenses.

¶17 Townsend estimated that the parties had spent an average of $1,432 per month on property maintenance for their home between 2016 and 2018. In assessing the parties' needs, Townsend did not allocate separate funds for pool services, house cleaning, or yard care services. In her financial declaration, Jenea asserted that in addition to $1,432 per month for general property maintenance, she needed $595 per month for yard care, $480 per month for house cleaning, and $720 per month for pool services. Although the parties owned other properties, they did not present evidence relating to the precise cost of maintaining or insuring those properties.

¶18 Townsend's report indicated that the parties had spent a total of $2,943.05 on telephone expenses over the three years he reviewed. Based on their historical spending, Townsend estimated that Jenea needed $40.88 per month for cell phone services. Jenea, on the other hand, asserted in her financial declaration that she needed $99 per month for a cell phone. She explained that the parties' businesses had historically paid for their phones but that she had researched cell phone plans and found them to cost an average of $100 per month.

¶19 Townsend included a section labeled "gifts" in his assessment of the parties' historical spending. This section included amounts the parties had spent at "gift" stores, party stores, floral shops, and wedding registries. He calculated that the parties' historical spending in this category amounted to an average of $41.47 per month. On the other hand, Jenea asserted in her financial declaration that she needed $250 per month for gifts.

¶20 Townsend did not include a separate expense for dining out in his report. However, Jenea asserted in her financial declaration that she spent $300 per month on dining out. With respect to entertainment, Townsend found that Jenea had a

monthly need of $426.18 while Shaun had a monthly need of $2,113.18. Jenea also listed $426 per month for entertainment on her financial declaration.

¶21    Townsend included attorney fees in his assessment of Jenea's monthly needs, estimating that she would need $929.88 per month. Jenea reported in her financial declaration that she was paying her attorneys $10,000 per month. She testified that her fees would continue after the divorce action ended because Shaun had sued her for defamation. She also requested that the court award her $250,000 in attorney fees based on her need for fees and Shaun's ability to pay.

¶22    As to Jenea's income, Rondeau reported that she had the ability to earn gross income of $25,000 per year, based on a vocational assessment, resulting in a net income of $1,438 per month. He also testified that he believed she could earn an additional $178,000 per year by investing $3 million of her assets without invading the principal.

¶23    Following trial, the district court asked the parties to prepare "proposed findings, conclusions, and a decree." Upon receiving the parties' proposals, the district court largely adopted Jenea's proposal as its final findings, conclusions, and decree, even leaving the word "proposed" in the document heading. The court replaced Jenea's introduction with its own, stating that it had "heard the evidence presented" and that it entered its findings of fact and conclusions of law "having received and considered the exhibits and being fully advised." But the only substantive change it made to Jenea's proposal concerned her requested award of attorney fees. With respect to attorney fees, the court found "that each party should pay his or her own respective attorney fees, expert fees, and costs in this matter."

¶24    The court found that it was appropriate "to value the marital estate at the time of trial." It further concluded that it was not appropriate to "tax affect any asset in this matter" because

while "the tax consequence is calculable, an event triggering the tax consequence is too speculative."

¶25　The court accepted Townsend's 2019 valuation of Logistics as its value at the time of trial, which amounted to $13,840,775. It found that while "Shaun does have some personal goodwill," it is not "as extensive as Shaun communicated to . . . Townsend." The evidence at trial indicating that the president and vice president were "also able to secure consulting contracts" undermined the importance of Shaun's role in securing the contracts. Thus, the court found it appropriate to "reduce . . . Townsend's percentage calculation of Shaun's personal goodwill in half, from 37.87% to 18.94%." This brought the marital value of Logistics to $11,918,308.

¶26　As to SCS, the court found the 2018 valuation to be a more appropriate measure of the business's value at the time of trial. It found that Smith's projections regarding SCS's performance were impeached by the fact that Shaun's distributions increased by $174,274 (approximately 28%) from 2018 to 2019, demonstrating that "SCS did not lose money in 2019, but in fact, made money." Because the 2019 valuation was based on inaccurate projections, the court concluded that the 2018 valuation of $3,776,775 was more accurate than the lower 2019 valuation.

¶27　With respect to the Heber Home, the court found that there was a lack of evidence relating to the $1.5 million promissory note, leading the court to "question[] whether a note between Shaun and Logistics exists, and even if it did exist, whether said note requires Shaun to pay Logistics $1,500,000.00." The court concluded that Shaun had acquired $100,000 of equity in the Heber Home through his monthly payments of $20,000 and $1.5 million of equity from his down payment. The court credited this total amount against Shaun's share of the marital estate.

¶28　The court also credited the unaccounted-for withdrawals from a marital account against Shaun's share of the marital estate,

finding that "Shaun made certain withdrawals from marital accounts that were never accounted for," amounting to $481,741.73. As to the 2019 tax refund, the court concluded that the overpaid taxes were marital funds subject to division and awarded the entire amount of the refund to Jenea. Finally, the court found that the Mercedes should be awarded to Jenea and the King Ranch truck should be sold, with the proceeds divided between the parties.

¶29 With respect to alimony, the district court imputed net income of $1,438 per month to Jenea. However, it did "not find it appropriate to impute Jenea additional income." The court explained that the parties had not historically invested "in stocks, bonds, or securities during the marriage," and it did not consider it appropriate to "force Jenea to do something with her portion of the marital estate that the parties did not do during the marriage." The court then found that Jenea had a monthly need of $21,093.36. Its findings in support of specific needs at issue on appeal include the following:

- The parties had historically paid their adult children's mission costs, and Jenea needed $450 per month to cover this expense.

- The parties had historically paid for their adult children's educational expenses, and Jenea needed $300 per month to cover this expense.

- Jenea had a reasonable need of $1,432 per month for real estate maintenance of her primary residence and a reasonable need of an additional $500 per month on each of two other properties she was awarded in the divorce (the Riverside Property and the SSR Holdings Property).

- Jenea had an additional need of $595 per month for yard care services, $480 per month for house cleaning services, and $720 per month for pool services.

- Jenea had a need of $200 per month for insurance on the Riverside Property and $200 per month for insurance on the SSR Holdings Property.

- Jenea had reasonable needs of $99 per month for cell phone services, $250 per month for gifts, and $300 per month for dining out.

- Jenea should receive an amount for entertainment expenses equal to Shaun, and $2,113.18 was a reasonable amount.

- Jenea's request for attorney fees was "excessive" and Townsend's estimate was "understated." Jenea had a reasonable need of $3,500 per month for attorney fees.

¶30 Following the district court's ruling, Shaun filed a motion under rule 59(c) of the Utah Rules of Civil Procedure, requesting that the district court either conduct "a second review of the evidence presented at trial" or conduct "a new trial." He asserted that the district court had erred in substantially adopting Jenea's proposed findings and pointed to several specific errors he believed the district court had made. The district court denied the motion, concluding that it "lack[ed] merit" and "fail[ed] to recognize all pertinent evidence." The court explained that it had entered its findings, conclusions, and decree "[a]fter much consideration" and that "much of" Jenea's proposal "was consistent with the Court's view of the evidence and testimony presented."

¶31 Shaun now appeals.

ISSUES AND STANDARDS OF REVIEW

¶32 Shaun challenges the district court's order in several respects, asserting (1) that the district court abused its discretion

by substantially adopting Jenea's proposed findings of fact; (2) that the court abused its discretion by valuing the marital property at the time of trial rather than at the time of the parties' separation; (3) that the court's findings regarding its valuation of the Heber Home, the businesses, and Shaun's goodwill, were not supported by the evidence; (4) that the court abused its discretion by not "tax affecting" the value of the businesses; (5) that the court's finding that Shaun dissipated the marital estate was not supported by the evidence; (6) that the court abused its discretion in dividing the parties' tax refund and two vehicles; (7) that the court made numerous findings relating to Jenea's needs that were not supported by the evidence; (8) that the court erroneously used alimony to award Jenea attorney fees rather than undertaking a traditional attorney fee analysis; and (9) that that court abused its discretion in refusing to impute additional income to Jenea based on what she could earn from investing her share of the marital estate.

¶33    "The court's valuation of the marital property, the manner in which it distributed that property, and its alimony determination are all subject to the same standard of review." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 39, 507 P.3d 385, *cert. denied*, 525 P.3d 1259 (Utah 2022). "In divorce actions, a district court is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (quotation simplified). "We can properly find abuse of the district court's discretion only if no reasonable person would take the view adopted by the district court," that is, if "a misunderstanding or misapplication of the law" resulted in "substantial and prejudicial error," if the court's factual findings are "clearly erroneous," or if the award is so seriously inequitable as to "manifest a clear abuse of discretion." *Wadsworth*, 2022 UT App 28, ¶ 39 (quotation simplified). "A district court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite

and firm conviction that a mistake has been made." *Gardner v. Gardner*, 2012 UT App 374, ¶ 16, 294 P.3d 600 (quotation simplified).

¶34 Shaun also challenges several of the court's evidentiary rulings pertaining to the admission of certain expert reports and the permissible scope of Smith's and the vice president's testimony at trial.[5] We review "a trial court's evidentiary rulings for an abuse of discretion" and its "interpretation of evidentiary rules for correctness." *State v. Alzaga*, 2015 UT App 133, ¶ 31, 352 P.3d 107.

## ANALYSIS

### I. Court's Adoption of Jenea's Proposed Findings

¶35 Shaun first argues that he should be granted a new trial because the district court erred by substantially adopting Jenea's proposed findings rather than preparing its own.[6] Our supreme

---

5. We have not addressed the factual background relating to these evidentiary rulings in detail because we ultimately determine that these issues are inadequately briefed.

6. Shaun also briefly asserts that the district court failed to comply with rule 52(a)(6) of the Utah Rules of Civil Procedure by failing to adequately explain the ground for its decision to deny Shaun's motion for a new trial. However, as Jenea points out, even if the court's statement of grounds was inadequate, the "failure to issue a statement of grounds is not reversible error absent unusual circumstances." *See Retherford v. AT&T Commc'ns. of Mountain States, Inc.*, 844 P.2d 949, 958 n.4 (Utah 1992). Shaun has not established that any such unusual circumstances are at play here, and ultimately, we do not conclude that any shortcomings in the district court's ruling hamper our ability to understand its reasoning or review its decisions on appeal. *See id.*

court has determined that a court "may ask counsel to submit findings to aid the court in making the necessary findings for the particular case." *Boyer Co. v. Lignell*, 567 P.2d 1112, 1113 (Utah 1977). And "while we do not recommend" that district courts "mechanically adopt" findings prepared by a party, they have the discretion to adopt the findings submitted to them "as long as the findings are not clearly contrary to the evidence." *Id.* at 1113–14 (quotation simplified); *see also Twitchell v. Twitchell*, 2022 UT App 49, ¶ 11 n.2, 509 P.3d 806 (declining to "go so far as to say that it is inappropriate for the court to fully adopt one party's proposed findings" so long as the court confirms "that the findings sufficiently explain the court's reasoning for the decision," that the evidence conforms to the findings, and that the findings "disclos[e] the steps by which the ultimate conclusion on each factual issue was reached").

¶36   Shaun asserts that previous cases that have approved a court's adoption of one party's findings have involved situations where the court had already ruled on the issues in the case and simply asked one party to draft proposed findings to support the court's decision. *See, e.g.*, *Whitear v. Labor Comm'n*, 973 P.2d 982, 984, 986–87 (Utah Ct. App. 1998) (administrative law judge ruled against the petitioner following a hearing and asked the respondent to "prepare proposed findings of fact, conclusions of law and an order"); *State v. James*, 858 P.2d 1012, 1014 (Utah Ct. App. 1993) (explaining that the court denied the motion to suppress and then "later executed findings of fact submitted by counsel for the State"). But other cases make it clear that, while not encouraged, the practice of having parties prepare proposed findings, even before a court has ruled, is not necessarily prohibited. *See, e.g.*, *Automatic Control Prods. Corp. v. Tel-Tech, Inc.*, 780 P.2d 1258, 1260, 1264 (Utah 1989) (majority opinion and Zimmerman, J., concurring in the result) (approving the adoption of findings of fact and conclusions of law, prepared after "the court took the case under advisement" but before

the court had "decided how the case was to come out," "without modifying or changing them in any respect" because there was "no indication from the record . . . that the trial judge failed to adequately deliberate and consider the merits of the case"); *Twitchell*, 2022 UT App 49, ¶ 11 n.2 (considering a situation where "the court did not announce a ruling from the bench at the conclusion of the trial" and, instead, "asked both parties to prepare proposed findings of fact and conclusions of law," ultimately adopting, "with only a few minor alterations," one party's proposed "findings of fact and conclusions of law in their entirety").

¶37    In the introduction to its findings and conclusions, the court here stated that it had reached its decision after "having heard the evidence presented, having received and considered the exhibits and being fully advised." And in denying Shaun's motion for a new trial, the district court explained that it had engaged in "much consideration" of the issues in the case and that "much of" Jenea's proposed findings were "consistent with the Court's view of the evidence and testimony presented." The sheer number of issues involved admittedly prompts some skepticism regarding the court's near-total alignment with Jenea's findings of fact and conclusions of law, and we are somewhat suspicious that "the trial court may have been less than assiduous in reviewing the proposed findings." *See Automatic Control Prods.*, 780 P.2d at 1264 (Zimmerman, J., concurring in the result); *see also Whitear*, 973 P.2d at 988 (Orme, J., dissenting in part) (expressing a desire not "to encourage any expansion of the practice" of "delegating the responsibility" of drafting findings of fact to counsel). Moreover, without any "guidance from the trial court as to how to craft their findings," "[i]t can be assumed that . . . each party prepared findings that were favorable to [them] on all points." *Automatic Control Prods.*, 780 P.2d at 1264 (Zimmerman, J., concurring in the result). Thus, there is certainly "some danger that in the press of business," the district court may have "rel[ied] too heavily on these proposals and inadvertently permit[ted] counsel to inject

findings that may not be entirely in conformity with the judge's views or that may deal with issues the judge [had] not even thought about." *See id.*

¶38 However, given the degree of discretion granted to district courts in making findings of fact, and the fact that our courts have approved time and again—albeit with some reservations—the practice of adopting findings drafted by counsel, we are not convinced that the court's decision to adopt the vast majority of Jenea's proposed findings requires that those findings be set aside in their entirety. Moreover, we are bound to "presume the regularity and validity of the district court's proceedings, and that it applied the correct legal standard, in the absence of evidence to the contrary." *Gerwe v. Gerwe*, 2018 UT App 75, ¶ 13, 424 P.3d 1113 (quotation simplified). And that presumption is reinforced by the district court's statement that it did, in fact, give "much consideration" to the findings before adopting them. Thus, we will uphold the district court's findings as long as they "disclos[e] the steps by which the ultimate conclusion on each factual issue was reached," *Twitchell*, 2022 UT App 49, ¶ 11 n.2, and "are not clearly contrary to the evidence," *see Boyer*, 567 P.2d at 1114. Accordingly, we proceed to examine each of the challenges Shaun has made to the court's specific findings.

## II. Valuation Date

¶39 Shaun argues that the district court abused its discretion by valuing the marital estate at the time of trial rather than at the time of separation. "Generally, the marital estate is valued at the time of the divorce decree or trial. However, in the exercise of its equitable powers, a trial court has broad discretion to use a different date, such as the date of separation, when circumstances warrant." *Shepherd v. Shepherd*, 876 P.2d 429, 432–33 (Utah Ct. App. 1994) (citations omitted). "[I]f the trial court uses a date other than the date of the divorce

decree, it must support its decision with sufficiently detailed findings of fact explaining its deviation from the general rule." *Id.* at 433. However, there is no corresponding requirement that the court make findings of fact to explain its decision *not* to deviate from the general rule.

¶40 Shaun refers us to several cases in which this court has upheld a district court's decision to use the date of separation rather than the date of trial as the valuation date for the marital property. However, each of these cases upholds a district court's decision to deviate from the general rule. *See Donnelly v. Donnelly*, 2013 UT App 84, ¶¶ 41–47, 301 P.3d 6 (upholding a decision to value a husband's retirement plan as of the date of separation because the court's decision was "adequately supported and explained"), *cert. denied*, 312 P.3d 619 (Utah 2013); *Jacobsen v. Jacobsen*, 2011 UT App 161, ¶ 39, 257 P.3d 478 (upholding valuation at time of separation because the "trial court clearly explained its rationale"), *cert. denied*, 263 P.3d 390 (Utah 2011); *Andrus v. Andrus*, 2007 UT App 291, ¶ 13, 169 P.3d 754 (upholding valuation of stock based on its average value over time rather than as of the date of trial because "the trial court noted multiple factors supporting its decision"). Shaun has pointed us to no case in which a district court's decision not to depart from the general rule was held to be an abuse of discretion. And while Shaun points to several facts he believes the district court *could* have relied on to support a valuation date other than the date of trial, he has failed to establish that the court abused its discretion by declining to do so. Indeed, many facts also suggest that valuing the estate at the time of trial was appropriate, such as that the parties filed joint tax returns during the period of separation and that Shaun retained control of the vast bulk of the parties' assets during the pendency of the divorce. Thus, it was not an abuse of the district court's discretion to decline to depart from the general rule and thus value the marital estate as of the time of the trial or decree.

### III. Value of Marital Assets

¶41 Shaun goes on to assert that several of the district court's findings of fact and conclusions of law regarding the value of the marital assets were not supported by the evidence.[7]

A.     Heber Home

¶42 Shaun argues that the district court erred in dividing $1.5 million worth of equity in the Heber Home, which represented the amount of Shaun's down payment on the home.[8] Shaun testified at trial that the $1.5 million down payment came from a loan provided by Logistics. He testified that the loan was secured by a promissory note "with a fair market interest rate" and that he would eventually pay that money "back into the business." However, Shaun did not produce the promissory note for the court, leading the court to "question[] whether a note between Shaun and Logistics exists" and what the note required if it did exist. For this reason, the court considered the $1.5 million down payment to constitute equity in the home, divisible as part of the marital estate.

¶43 Shaun asserts that the court erred in disregarding his testimony about the promissory note, essentially because there was no evidence demonstrating that he did not obtain financing for the down payment. But the court was not required to accept

7. Many of Shaun's arguments concern the fact that certain assets were obtained during the period between the parties' separation and trial. However, as we have rejected Shaun's contention that the district court erred in valuing the marital estate at the time of trial, we consider such arguments to be irrelevant and accordingly disregard them.

8. On appeal, Shaun does not challenge the district court's finding that he acquired $100,000 in marital equity through his mortgage payments.

his testimony at face value, nor was Jenea required to prove a negative to discredit his testimony. The court accepted evidence that Shaun made a $1.5 million down payment on the Heber Home and, based on that evidence, could find that the $1.5 million constituted equity in the home. Without having a chance to review the alleged promissory note, the court was well within its discretion to question the credibility of Shaun's representation that such a note existed.

¶44    Moreover, even if we were to agree with Shaun that the court was required to view the $1.5 million as a debt that had to be paid back, the creditor for the loan was a business belonging to the parties. And there is no evidence that the value of a $1.5 million promissory note was added to the value of Logistics in the experts' calculations. Were Shaun allowed to treat the $1.5 million down payment as a debt, without allocating an equal value to Logistics in the form of an account receivable, he would essentially be able to shield $1.5 million of marital assets for himself. Either (a) he would be allowed to keep the $1.5 million value taken from a marital asset for himself and never pay back Logistics or (b) he would be allowed to artificially reduce the value of Logistics prior to its valuation and division in the divorce and then put the $1.5 million back into the business after the divorce is final. Either result is impermissible. Indeed, it would have been an abuse of the district court's discretion not to treat the $1.5 million down payment as equity without adding an additional $1.5 million to the value of Logistics. *See Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 55, 507 P.3d 385 (holding that in assigning value to loans from the husband to the parties' businesses, it was an abuse of the district court's discretion to include "accounts payable in its calculation" of the businesses' liabilities "without also crediting the notes receivable to [the husband] as an asset"), *cert. denied*, 525 P.3d 1259 (Utah 2022). Thus, we have no trouble upholding the district court's division of the equity in the Heber Home.

B.     Businesses

¶45     Shaun next takes issue with the district court's decision to use Townsend's 2019 valuation of Logistics while using his 2018 valuation of SCS. Shaun frames this decision as the court using two different valuation dates for the two businesses, but we do not see it that way. As established above, the court assessed the value of the marital estate as of the *date of trial*. It merely used the valuations provided by the experts in assessing what that value might be.

¶46     Thus, if the district court's review of the evidence convinced it that the 2018 valuation of SCS more accurately reflected the business's value at the time of trial than the 2019 valuation, it was within the court's discretion to use that number as a basis for its then-current valuation. And the evidence did, in fact, support such a determination. The court had before it the following evidence regarding the value of SCS:

- When asked which valuation was "a more reliable indicator of the company's value" at the time of trial, Townsend answered that "the more recent one would be the better indicator" but that he was not sure "how reliable either one would be as far as the value today" and that "they may be good indicators of the value today or they may not" because he did not "know what's happened in the last two years."

- When asked why the valuation of SCS decreased between 2018 and 2019, Townsend answered that its "revenues and profits plummeted," with its revenue declining by approximately $40 million between 2018 and 2019.

- Townsend testified that he used "a projection that the company provided" as "a primary information source" for completing the February 2019 valuation.

- Townsend testified that Smith projected at the time of Townsend's valuation in 2019 "that . . . the company was going to lose money going forward" over the next several years.

- Townsend testified that Smith's projections would be impeached if it turned out that "Shaun's distributions from 2018 to 2019 increased."

- Shaun's distributions from SCS increased from $617,425 in 2018 to $791,699 in 2019.[9]

¶47 Based on the evidence, it was not an abuse of discretion for the district court to take the view that the more than 28% increase in distributions Shaun took from SCS in 2019 demonstrated that the projections on which Townsend had primarily relied in assigning a value to SCS had been impeached, that the value of SCS had actually increased following Townsend's 2019 valuation, and that its true value was therefore closer to Townsend's 2018 valuation than his 2019 valuation. And in fact, the court did find that the projections of future losses were impeached and that

---

9. Shaun asserted at oral argument that his increase in distributions was the result of a "unicorn event" in which Logistics received an influx of approximately $4 million from the proceeds of a lawsuit that resolved in 2019. But he did not assert this argument in his brief on appeal, and we are unclear on how an influx of cash to Logistics would have affected Shaun's distributions from SCS. At trial, Shaun used the influx of money from the lawsuit to explain the increase of his Logistics distributions from $3,532,396 in 2018 to $8,656,850 in 2019, not to explain the increase in distributions from SCS. And even if the extra money did affect the value of SCS, Shaun has failed to explain why Jenea would not be entitled to share in that increase, which occurred before trial when the marital estate was valued.

"SCS did not lose money in 2019, but in fact, made money." Thus, its findings support its valuation of the two businesses.

C. Goodwill

¶48 Shaun next contests the district court's finding that his personal goodwill amounted to only 18.94% of Logistics' value, asserting that the district court's calculation was speculative and not based on the evidence. "Personal goodwill is based on an individual's reputation for competency and is not subject to distribution upon divorce." *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 15, 440 P.3d 757 (quotation simplified). Thus, any portion of Logistics' value attributable to Shaun's personal goodwill was not divisible as a marital asset.

¶49 "Generally, we will uphold a district court's valuation of marital assets as long as the value is within the range of values established by all the testimony, and as long as the court's findings are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 64, 507 P.3d 385 (quotation simplified), *cert. denied*, 525 P.3d 1259 (Utah 2022). "Courts are not bound to accept the testimony of an expert and are free to judge the expert testimony as to its credibility and its persuasive influence in light of all of the other evidence in the case." *Barrani v. Barrani*, 2014 UT App 204, ¶ 4, 334 P.3d 994 (quotation simplified). This is true even "when that expert's opinion is unchallenged by the opinion of an opposing expert." *Lyon v. Bryan*, 2011 UT App 256, ¶ 10, 262 P.3d 1199; *see also Glauser Storage, LLC v. Smedley*, 2001 UT App 141, ¶ 24, 27 P.3d 565 ("Even where testimony is uncontroverted, a trial court is free to disregard such testimony if it finds the evidence . . . not credible." (quotation simplified)).

¶50 Here, the court was presented with an opinion from Townsend that 37.87% of the value of Logistics was attributable to Shaun's "personal knowledge and abilities and contacts and

what he contributes to the business." Townsend calculated this number "primarily based on [his] understanding of how the company acquires contracts for its consulting business" and Shaun and Smith's "explanation of [Shaun's] role in obtaining those contracts." However, Townsend indicated that if there were other individuals at the company who had key roles in obtaining contracts, that fact would "temper[]" his assessment of Shaun's goodwill. Rondeau testified that he believed Townsend's assessment of Shaun's personal goodwill was "reasonable." Smith testified that the company's president and vice president secured consulting contracts, Shaun also testified that he works with the president and vice president on securing contracts, and the vice president testified that he works with Shaun and the president to "close" deals.

¶51 The district court found that while "Shaun does have some personal goodwill," it is not "as extensive as Shaun communicated to . . . Townsend." The court found that some "information provided by Shaun and his management team to . . . Townsend" was "faulty and inaccurate" and that the evidence at trial indicating that the president and vice president were "also able to secure consulting contracts" undermined the importance of Shaun's role in securing the contracts. In reaching this conclusion, the district court could very well have concluded that Shaun's goodwill had no value or, at least, that it could not assign it a value due to a lack of credible evidence. But the court did not consider the evidence that other individuals could secure consulting contracts to indicate that Shaun had no personal goodwill in Logistics. Rather, the court concluded from the evidence that Shaun's goodwill had "some" value—just not as much as Townsend estimated. To resolve the conflict in the testimony, the court elected to value Shaun's goodwill at half of Townsend's estimate. We cannot say that this finding fell outside "the range of values established by all the testimony." *Wadsworth*, 2022 UT App 28, ¶ 64 (quotation simplified); *see also Weigel v. Weigel*, 24 N.E.3d 1007, 1011 (Ind. Ct. App. 2015) ("There is no

abuse of discretion where sufficient evidence and reasonable inferences support the trial court's valuation."). Moreover, the court's findings were "sufficiently detailed" and included "enough subsidiary facts to disclose the steps by which" it reached the conclusion it did. *See Wadsworth*, 2022 UT App 28, ¶ 64 (quotation simplified). Accordingly, we decline to disturb them.

## IV. Taxes

¶52　Shaun argues that the court should have "tax affected" the marital businesses by reducing their value to take into account the taxes that would need to be paid if the businesses were sold. The court declined to do this, explaining that although "the tax consequence is calculable," tax affecting the businesses in assessing their value for purposes of dividing the marital estate was inappropriate because "an event triggering the tax consequence is too speculative."

¶53　We agree with Jenea that the district court's decision not to tax-effect the businesses is consistent with Utah law. "We do not generally expect courts to speculate about hypothetical future tax consequences." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 97, 507 P.3d 385 (quotation simplified) (rejecting the argument that a wife's property award should be decreased based on possible transaction costs the husband would incur if he liquidated the business), *cert. denied*, 525 P.3d 1259 (Utah 2022); *see also Morgan v. Morgan*, 795 P.2d 684, 690 (Utah Ct. App. 1990) (explaining that courts are under "no obligation to speculate about hypothetical future tax consequences" (quotation simplified)), *cert. denied*, 860 P.2d 943 (Utah 1993). The sale of a business has tax consequences only if the business is actually sold, which may be long in the future when tax laws have changed or may not happen at all. *Cf. Howell v. Howell*, 806 P.2d 1209, 1213–14 (Utah Ct. App. 1991) (rejecting an argument that the tax associated with selling real property should have been deducted from the value of the

property because such taxes were speculative), *cert. denied*, 817 P.2d 327 (Utah 1991).

¶54    Shaun asserts that the tax consequences in this case are not speculative because they can be calculated. But future tax consequences of selling a business are not speculative merely because they are incalculable; they are speculative because they may not occur at all. While Shaun's experts may have been able to calculate his theoretical tax liability based on a sale of the business at the time of trial, there was no way to know what liability he would actually incur if he were to sell the business many years down the road. And if he never sells the business, he will never incur the tax consequences.

¶55    We also think it worth noting that the district court here awarded Shaun the entire value of the businesses and then offset Jenea's share with comparable assets and a structured cash payout over several years. The entire purpose of such an arrangement is to help the parties avoid selling a large and profitable business and, presumably, likewise avoid the associated transaction costs that would eat into both parties' share of those assets. This division ultimately gave Shaun the freedom to decide whether to sell the businesses and incur the tax consequences, with no input from Jenea. In such a situation, we have observed that it is equitable to put the burden of any speculative future tax or other transaction costs associated with a sale on the party who is awarded the asset. *See Wadsworth*, 2022 UT App 28, ¶ 98. The same is true here.

### V. Dissipation

¶56    Shaun next takes issue with the district court's finding that he dissipated the marital estate by failing to account for withdrawals of marital funds totaling $481,741.73. He points to evidence indicating that these funds could be traced to two transfers to the account from the parties' Ameritrade account in the amounts of $250,000 and $220,988.66 in September 2018. He

then asserts that this money was his separate property because the parties agreed to divide $700,000 from the Ameritrade account at the time the court issued temporary orders in the case.

¶57    Having reviewed this argument, we conclude that it is inadequately briefed. First, Shaun has addressed only two of the six withdrawals from which the court calculated the dissipation amount, so even if we accepted his argument that the two Ameritrade transfers were his separate property, he has still not accounted for the remaining $10,753.07 the court found had been dissipated. Second, the numbers he provides simply do not add up. Shaun was entitled to remove only $350,000 from the Ameritrade account as his separate property, but he made withdrawals from the account totaling $470,988.66. There is no evidence explaining why he would have withdrawn more than his allotted $350,000. The evidence suggests that the Ameritrade account had $734,344 as of June 1, 2018, that each party received $350,000 from that account, and that the remaining $34,344 was ultimately awarded to Shaun as part of his share of the marital estate. But Shaun does not point us to the evidence in the record showing the disbursements from the Ameritrade account, so we do not know when the parties withdrew their respective $350,000 or what went in or out of the account after June 1, 2018. Moreover, Shaun's explanation that he spent his separate monies on a vehicle, a boat, and other personal property is not supported by record cites on appeal. In short, we simply do not have enough information to conclude that Shaun's unaccounted-for withdrawals could be traced to his separate property, let alone to conclude that the district court clearly erred in finding that those withdrawals were marital funds.

## VI. Property Division

¶58    Shaun also takes issue with the district court's division of two specific items of marital property: the parties' tax refund and two vehicles.

A.    Tax Refund

¶59    First, Shaun argues that the court should not have awarded the parties' 2019 tax refund to Jenea. His only argument in support of this assertion is that the parties "had a practice of applying any refund to the tax obligation for the following year." We find no merit to this argument.

¶60    It is unclear whether Shaun is asserting that he should have been allowed to apply the entire refund to his 2020 taxes without reimbursing Jenea for her share or if he is suggesting that her share should have been offset in some other way. The tax refund is certainly a marital asset, subject to division between the parties. So if his position is that Jenea was not entitled to any portion of the tax refund, he is mistaken. But even if he is asserting that Jenea's share should have been offset in some other way, he has not shown that the district court abused its considerable discretion in awarding this cash asset to Jenea as it attempted to equalize the estate and reduce the amount of the equalization payment Shaun would have to make later.

B.    Vehicles

¶61    Second, Shaun argues that the court erred in awarding Jenea a 2020 Mercedes Benz G Wagon and ordering him to sell a 2019 King Ranch truck and divide the proceeds with Jenea.

¶62    With respect to the Mercedes, Shaun simply argues that it was unfair for the district court to award Jenea his "personal" vehicle. But this was a matter firmly within the district court's discretion. Shaun was awarded three other personal vehicles as well as numerous recreational vehicles. Jenea was awarded only one other vehicle apart from the Mercedes. We cannot say that this division was an abuse of the district court's discretion, especially given that awarding Jenea the $125,000 Mercedes could help to offset the large equalization payment Shaun would be required to make.

¶63    With respect to the King Ranch truck, Shaun argues that the court erred in failing to give him credit for the value of another vehicle he traded in to buy it. According to Shaun, he traded in a 2017 Ford F350 Super Duty truck worth $55,000, which was awarded to him in the divorce and counted against his share of the property division, to buy the King Ranch truck. However, Shaun did not present the court with any evidence from which the court could have recognized that the value of the Ford truck was tied up in the value of the King Ranch truck. At trial, Shaun testified that he "traded [his] truck in" to buy the King Ranch truck and that he paid an additional $12,000 to $15,000 on top of the trade in. But it was not clear from this testimony that the "truck" he was referring to was another truck that was already being considered as part of the marital estate, much less which truck it was.[10] And in fact, Shaun's proposed property division listed both the Ford truck and the King Ranch truck separately, suggesting that he still had possession of both. Because the court was presented with no evidence that the King Ranch truck was purchased with a trade-in of the Ford truck, the court had no basis for deducting the value of the Ford truck from the sale of the King Ranch truck before dividing the proceeds.

## VII. Assessment of Jenea's Need

¶64    Shaun raises several challenges to the court's findings relating to Jenea's needs. We address each in turn.

### A.    Adult Children's Expenses

¶65    The district court included $300 per month for "adult college aged child" expenses in its calculation of Jenea's needs because it concluded that the parties had "paid their adult children's education expenses during the course of the marriage."

_____

10. Four separate trucks were distributed by the court in the parties' decree: the Ford truck, the King Ranch truck, another Ford F350, and a Dodge Ram.

On appeal, Shaun asserts that courts are prohibited from using alimony as a means to pay an adult child's expenses. However, Shaun did not raise this argument before the district court, and it is therefore not preserved for our consideration.[11]

¶66    Shaun also asserts that there was no evidence from which the court could have determined that Jenea actually incurred expenses on behalf of their adult children. On this point, we agree with Shaun. The evidence presented at trial indicated that Shaun paid for their two daughters' "tuition and . . . housing," for their oldest son's "college-related expenses," and for their youngest son's "full-time living expenses." Jenea asserts that "'education expenses' include more than 'tuition and housing,'" and that it was within the court's discretion to award her funds "to help pay for those costs." While the first of these propositions may be true, there was still no evidence from which the district court could have found that any of the children's expenses were actually

---

11. We do observe that this question appears to have been resolved already in *Olsen v. Olsen*, 2007 UT App 296, 169 P.3d 765, in which a panel of this court held that a district court could consider payment of a health insurance premium for adult children in the calculation of an alimony recipient's needs because the "parties had always maintained health insurance for their now majority-aged-children and . . . the insurance expense was part of [the parties'] established standard of living." *Id.* ¶ 28. While a court cannot order payment of child support for adult children, *see Ferguson v. Ferguson*, 578 P.2d 1274, 1275 (Utah 1978), or count expenses for *minor* children—whose expenses are presumed to be covered by child support—in an alimony needs analysis, *see Farnsworth v. Farnsworth*, 2012 UT App 282, ¶ 27, 288 P.3d 298 (McHugh, J., concurring in part and dissenting in part), *Olsen* indicates that expenses for *adult* children may be included as alimony if evidence demonstrates that paying those expenses was part of the parties' standard of living during the marriage, *see* 2007 UT App 296, ¶ 28.

being paid for by Jenea. None of the children were living with Jenea at the time of trial, and she did not testify to any specific expenses—apart from one child's mission expenses, which were included as a separate line item—that she incurred on behalf of her adult children.

¶67 While we conclude that Jenea's financial declaration alone constituted sufficient evidence of some expenses Shaun challenges, such as the home maintenance and dining-out expenses we discuss below, *see infra* ¶¶ 75, 82, we cannot say the same of the adult child expense. It was reasonable for the court to accept that Jenea would incur expenses dining out or maintaining her pool based merely on the fact that she needs to eat and that she has a pool. It was not likewise reasonable for the court to accept that Jenea pays expenses for her adult children when she has no legal obligation to do so, and the evidence at trial indicated that none of the children lived with her and that Shaun was paying their expenses. Thus, the court exceeded its discretion in allocating adult child expenses to Jenea in calculating her need.

B. Mission Costs

¶68 Shaun asserts that the religious mission costs for the parties' adult child was not an appropriate line item to include in Jenea's need calculation because that cost would continue for a short period of time but he would be required to continue paying alimony based on that amount for many years. He argues that including an item in Jenea's expense calculation that would last for only a few years was an abuse of the district court's discretion. However, he cites no law in support of his position that a court is not permitted to consider short-term expenses in its needs calculation.[12]

---

12. Again, Shaun argues that the court was not permitted in any event to include expenses relating to adult children in its needs

(continued…)

¶69 This court was faced with a similar question in *Miner v. Miner*, 2021 UT App 77, 496 P.3d 242. In that case, the district court included a line item in the wife's needs calculation for monthly payments on her student loans, even though the student loans would be paid off within four years. *Id.* ¶¶ 41–42. We concluded that it was not plain error[13] for the court "to allocate an amount for . . . an expense" that existed during the marriage "even if it may not be certain that the expense will be present for the entire . . . alimony period." *Id.* ¶ 43. We also observed that "prospective changes to alimony are disfavored" unless a future event affecting the alimony calculation "is certain to occur within a known time frame." *Id.* (quotation simplified). Given that the time it would take to pay off the student debt was certain, we concluded that "it would have been within the court's discretion to order a prospective change" to alimony at the time the loan would be paid off, had the husband asked for one, but that the court was not required to do so. *Id.*

¶70 Here, there was evidence that Jenea and Shaun paid for their oldest son's mission while they were married and that, at the time of trial, Jenea was paying the cost of their daughter's mission alone. Moreover, the parties had two more children that could elect to serve missions at a later time, at least one of whom was "currently planning on serving [a religious] mission." The fact

calculation. However, he did not preserve this challenge in the district court, and even on appeal, he did not raise it until his reply brief. Thus, we do not consider this argument further, though we once again note that we are skeptical as to its merit. *See supra* note 11.

13. The inclusion of the student loan expense in *Miner* was reviewed for plain error because the husband had not preserved his challenge. However, we are not convinced—and Shaun has not argued—that the court's conclusion in *Miner* would have been different had the issue been preserved.

that Jenea was continuing to incur an expense that was part of her standard of living during the marriage supported the court's inclusion of that expense in its needs calculation. And since it was uncertain whether Jenea would incur the same expense for her remaining two children, the end date for Jenea's need was uncertain. Thus, it was not an abuse of the district court's discretion to include the mission expense in its calculation of Jenea's needs and its award of alimony.

C.      Home Maintenance Expenses

¶71     Shaun argues that the court's inclusion of $500 per month each for real estate maintenance of the Riverside Property and the SSR Holdings Property was not supported by the evidence and that the court "double counted" Jenea's expenses for yard care, house cleaning, and pool services by including those expenses as separate line items in addition to the general line item for real estate maintenance of $1,432 per month on her primary residence.

¶72     First, Shaun asserts that "the trial court had no evidence to make any finding regarding a reasonable maintenance amount for either of the additional real properties that it referenced." We disagree. "Utah has an interest in ensuring that marital assets are fairly and equitably distributed during divorce and that divorcing spouses both retain sufficient assets to avoid becoming a public charge." *Dahl v. Dahl*, 2015 UT 79, ¶ 25, 459 P.3d 276. When it comes to crafting an alimony award, this means that "trial courts have wide discretion to fashion remedies that fit the situation faced by the family at issue." *Wellman v. Kawasaki*, 2023 UT App 11, ¶ 16, 525 P.3d 139. Thus, "[w]hen a party obviously underestimates . . . or overestimates . . . his or her living expenses, the trial court is not limited to awarding either the reported amount or nothing. Instead, the dearth of credible evidence regarding a particular claim simply renders the quantum of evidence as to that claim insufficient." *Sauer v. Sauer*, 2017 UT App 114, ¶ 9, 400 P.3d 1204. If a court determines that there is a lack of

credible and relevant evidence regarding one of the alimony factors, the court may "impute a reasonable amount based on other evidence provided by the parties." *Id.* ¶ 10; *accord Dahl*, 2015 UT 79, ¶ 116. We will uphold such an imputation "as long as there is sufficient evidence to support" it. *Wellman*, 2023 UT App 11, ¶ 17. Such evidence may include "the opposing party's documentation," "updated financial declarations supported . . . by the sworn testimony of witnesses," *id.*, evidence of the other party's reasonable need, *Sauer*, 2017 UT App 114, ¶ 10, information about the parties' expenses during the marriage, or a "reasonable estimate" of the party's need, *Dahl*, 2015 UT 79, ¶ 116. So long as the court supports its alimony determinations with "specific findings, supported by evidence in the record," we will not disturb its decision. *Wellman*, 2023 UT App 11, ¶ 18.

¶73 Although the parties do not appear to have presented specific evidence regarding the cost of maintaining the Riverside Property and the SSR Holdings Property, there would undoubtedly be at least some cost to maintain them. The court found that the value of Jenea's primary residence was $1,833,333. It found the value of the Riverside Property and the SSR Holdings Property to be $925,000 and $3,275,000, respectively. The Riverside Property was a home, and the SSR Holdings Property was undeveloped land. Townsend's report estimated that the parties had spent an average of $1,432 per month maintaining their primary residence between 2016 and 2018. In light of those numbers, we cannot say that imputing $500 per month each for maintenance of the Riverside Property and the SSR Holdings Property was unreasonable.

¶74 Shaun next argues that yard care, house cleaning, and pool services were encompassed in Townsend's calculation of the parties' home maintenance costs, pointing to amounts in Townsend's records indicating that the parties had paid sums to Completely Clean ($6.25 per month on average), Stewarts Lawn Service ($14 per month on average), and Paradise Pools ($266.03

per month on average) between January 1, 2016, and December 31, 2018. We agree with Jenea that these line items do not indicate that the court double counted these expenses.

¶75   Jenea asserted in her financial declaration that, apart from her other home maintenance costs, which she estimated to be $1,432 for her primary residence, she spent $595 per month on yard care, $480 per month on house cleaning, and $720 per month on pool services. The court agreed that $1,432—which was also the amount estimated by Townsend for the parties' monthly home maintenance expenses—was reasonable. It also found the expenses for yard care and pool services to reasonably reflect the cost of these items during the marriage in light of the pictures it had reviewed of the yard and pool. Finally, it found the house cleaning cost to be reasonable in light of Jenea's testimony that the parties had used house cleaners during the marriage that came every week or every other week. This evidence was sufficient to support the court's findings regarding the home maintenance, yard care, house cleaning, and pool service costs.

¶76   But even considering the contrary evidence Shaun points to, we are not convinced that any double counting could have occurred. First, Shaun has pointed to no evidence indicating what expenses these three line items actually reflected. While we can surmise, based on the business names, that they were expenses for yard care, cleaning services, and pool services, there is no evidence of that in the record. We also do not know whether these were one-time or ongoing costs. For example, we know from Townsend's report that the parties paid $9,576.95 to Paradise Pools at some point between January 1, 2016, and December 31, 2018 (which Townsend divided across thirty-six months to get a monthly average of $266.03). But we do not know whether this was a one-time charge for installation or repair, a monthly charge for pool cleaning, or something else. In the case of the payments to Completely Clean and Stewarts Lawn Care, not only do we not know what the payments actually covered, but it is apparent even

to the most uneducated observer that the monthly average ($6.25 and $14 per month, respectively) comes nowhere close to covering the cost of house cleaning or yard care for even the most modest home, let alone a $1.8 million property with extensive landscaping.

### D.     Entertainment and Miscellaneous Items

¶77     Finally, Shaun asserts that the following findings of Jenea's needs were not supported by the evidence: $200 per month for real estate insurance on the Riverside Property, $200 per month for real estate insurance on the SSR Holdings Property, $99 per month for telephone expenses, $250 per month for gifts, $300 per month for dining out, and $2,113.18 per month for entertainment. Jenea asserts that Shaun has not preserved his challenges to these findings. However, while parties must preserve a challenge to the *adequacy of the detail* in a court's factual findings by giving the court an opportunity to correct the alleged error, a party need not take extra steps to preserve a challenge to the *sufficiency of the evidence* supporting the findings. *See In re K.F.*, 2009 UT 4, ¶¶ 60–62, 201 P.3d 985. Thus, to the extent these challenges are based on the sufficiency of the evidence, we conclude that they are preserved. However, we do not agree with Shaun that the evidence was insufficient to support the district court's imputation of these expenses in calculating Jenea's needs.

¶78     As we discussed in the previous section, courts may rely on evidence in the record to impute need figures even where the evidence is insufficient to support precise numbers. *Dahl v. Dahl*, 2015 UT 79, ¶ 116, 459 P.3d 276. This is exactly what happened here, and we cannot say that the district court exceeded its discretion in making its imputations.

¶79     First, for the same reasons we uphold the district court's imputation of maintenance costs for the Riverside Property and the SSR Holdings Property, we conclude that evidence that Jenea paid $600 for insurance on her primary residence, coupled with

evidence of the value of the various properties, made the court's imputation of $200 per month each for the Riverside Property and the SSR Holdings Property to be a reasonable estimate of Jenea's need.

¶80 We also find $99 per month for cell phone service to be a reasonable estimate of Jenea's need. Jenea asserted in her financial declaration that she expected cell phone service to cost $99. She explained that the parties' businesses had historically paid for their phones but that she had researched cell phone plans and found them to cost an average of $100 per month. Townsend's report showed that the parties had spent $2,943.05 on telephone expenses between January 1, 2016, and December 31, 2018. Dividing that amount by thirty-six months and then dividing it between the parties, he concluded that each party needed $40.88 per month for telephone service, and Rondeau agreed. However, the court found their estimates to be "arbitrarily low" and accepted Jenea's figure of $99. It was the court's prerogative to reject the experts' opinions, and Jenea's representations regarding her need were sufficient to support its finding that $99 per month was reasonable.

¶81 As to gifts, Jenea asserted in her financial declaration that she needed $250 per month, contrary to Townsend's estimate that the parties' spent an average of $41.47 per month on "gifts."[14] The court considered Townsend's estimate "to be low for the parties and the standard of living" and therefore accepted Jenea's representation as "fair and reasonable." We agree with Jenea that

---

14. Townsend's calculation of "gifts" does appear to have been somewhat arbitrary. Rather than estimating what the parties had actually spent on gifts, Townsend used the parties' purchases from certain types of stores—"gift" stores, party stores, floral shops, and wedding registries—to estimate what they had spent on gifts over three years. Presumably, the parties purchased gifts from other types of retailers as well.

her estimate could support the court's imputation of this expense, even in the absence of further documentation. In the absence of detailed evidence of need, the court was entitled to rely on a "reasonable estimate." *Dahl*, 2015 UT 79, ¶ 116.

¶82 The court also found Jenea's estimate of $300 per month for dining out to be reasonable. Again, the court's reliance on Jenea's estimate was sufficient to support its decision.[15]

¶83 Finally, the court adjusted Jenea's requested entertainment expense of $426.18 to $2,113.18. The court explained that it believed that the parties' "entertainment expense should be equal" and that "based upon the evidence related to the standard of living," the $2,113.18 attributed to Shaun was "reasonable." Courts have discretion to reject a party's claimed need if it deems that amount to be underestimated based on the marital standard of living. *See Miner v. Miner*, 2021 UT App 77, ¶ 39, 496 P.3d 242; *Sauer v. Sauer*, 2017 UT App 114, ¶ 10, 400 P.3d 1204. And when a court so finds, it may use the other party's reasonable need to estimate the appropriate level of need. *See Miner*, 2021 UT App 77, ¶ 39; *Sauer*, 2017 UT App 114, ¶ 10. That is precisely what occurred here. Because the court relied on Townsend's estimate of Shaun's reasonable entertainment expenses to impute Jenea's reasonable

---

15. Based on our own review of the record, it does appear that Townsend included dining out in his estimate of the parties' food and household expenses, which the court adopted and included in its needs assessment for Jenea. Thus, it is possible that the expense for dining out was double counted. But Shaun did not point out this discrepancy to the district court or address it on appeal. Indeed, his only argument on appeal is that the court's calculation was "speculative" and not supported by evidence. Because we conclude that the court was within its discretion to rely on Jenea's estimate in her financial declaration, we reject Shaun's argument.

entertainment expenses, its finding was supported by the evidence.

## VIII. Attorney Fees

¶84 Shaun next challenges the district court's inclusion of Jenea's attorney fees in her needs calculation, asserting that the district court did not properly analyze and award the attorney fees under the appropriate provisions of the Utah Code and the Utah Rules of Civil Procedure.

¶85 In divorce actions, Utah law allows a court to "order a party to pay the costs, attorney fees, and witness fees . . . of the other party to enable the other party to prosecute or defend the action." Utah Code § 30-3-3(1); *see also* Utah R. Civ. P. 102(a). "Such an award must be based on evidence of the receiving spouse's financial need, the payor spouse's ability to pay, and the reasonableness of the requested fees." *Dahl v. Dahl*, 2015 UT 79, ¶ 168, 459 P.3d 276 (quotation simplified); *see also* Utah R. Civ. P. 102(b).

¶86 While an award of alimony is based on similar principles—also weighing the requesting party's need against the other party's ability to pay, *see Bakanowski v. Bakanowski*, 2003 UT App 357, ¶ 8, 80 P.3d 153—the basis of the needs assessment is different. A party shows a need for purposes of an attorney fee award by showing that they "lack[] the financial resources to pay the costs and fees . . . necessary for the proper prosecution or defense of the action." Utah R. Civ. P. 102(b)(1), (3). A party shows a need for alimony, on the other hand, by demonstrating the amount they need to maintain their marital standard of living. *See Martinez v. Martinez*, 818 P.2d 538, 542 (Utah 1991) ("Usually the needs of the spouses are assessed in light of the standard of living they had during [the] marriage.").

¶87 The attorney fees Jenea incurred in connection with the divorce—and even more glaringly, the fees she incurred in

connection with the defamation case—were not part of the marital standard of living because those fees did not arise until after the parties had separated. Thus, they should not have been considered as part of the needs analysis for purposes of alimony. Instead, if the court was inclined to award Jenea her attorney fees relating to the divorce action,[16] it should have made the necessary findings to support that award under Utah Code section 30-3-3 and rule 102 of the Utah Rules of Civil Procedure. *See Eberhard v. Eberhard*, 2019 UT App 114, ¶ 52, 449 P.3d 202 (requiring that an award of attorney fees "be based on sufficient findings" (quotation simplified)). We therefore reverse the district court's finding, for alimony purposes, that Jenea was entitled to $3,500 per month for attorney fees. However, as we are not sure whether the district court's decision not to award attorney fees as part of the divorce case generally was based on its inclusion of those fees in the alimony award, we remand for the district court, if it is so inclined, to make additional findings regarding Jenea's request for attorney fees.

IX. Jenea's Income for Alimony Purposes

¶88　Shaun argues that the district court should have considered Jenea's ability to earn income from her property distribution in assessing her ability to meet her own needs for alimony purposes. He points to testimony from Rondeau indicating that Jenea could potentially earn $178,000 a year by investing $3 million of her assets without invading the principal.

¶89　"If [a] payee spouse has income-producing property, the income from that property may properly be considered as eliminating or reducing the need for alimony by that spouse." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 103, 507 P.3d 385

---

16. There was no basis for the district court to award Jenea fees associated with the defamation case. Such fees should be assessed and awarded, if appropriate, in that case.

(quotation simplified), *cert. denied*, 525 P.3d 1259 (Utah 2022). However, the court has significant discretion in determining whether to count such property as income. *See Eberhard v. Eberhard*, 2019 UT App 114, ¶ 21, 449 P.3d 202 ("[W]hile . . . caselaw directs district courts to *consider* all sources of income when determining alimony, it does not dictate that all sources of income be *counted* as income received by a spouse for that purpose."); *accord Mintz v. Mintz*, 2023 UT App 17, ¶ 49, 525 P.3d 534. One of the key considerations is whether the property is income-producing. *See Batty v. Batty*, 2006 UT App 506, ¶ 5, 153 P.3d 827 (observing that it is "particularly" appropriate to consider the property division in calculating an alimony recipient's income where the property is "income-generating"); *see also Mortensen v. Mortensen*, 760 P.2d 304, 308 (Utah 1988); *Wadsworth*, 2022 UT App 28, ¶ 103. But courts typically do not expect a party to use their property in a way they would not otherwise be inclined to. For example, it was not an abuse of a district court's discretion not to impute investment income to a wife for alimony purposes where the evidence showed the parties had a history of reinvesting their investment returns rather than living off them. *Mintz*, 2023 UT App 17, ¶ 59. Likewise, it was not an abuse of discretion for a district court not to calculate an alimony recipient's income based on "funds that [she] could potentially draw from her retirement accounts or that she could receive by electing to collect Social Security benefits early." *Eberhard*, 2019 UT App 114, ¶ 22.

¶90 Here, the court found that "[t]he parties did not invest in stocks, bonds, or securities during the marriage"—a finding which Shaun does not contest—and "decline[d] to force Jenea to do something with her portion of the marital estate that the parties did not do during the marriage." These findings support the district court's determination not to impute income to Jenea based on what she could potentially earn from investing her share of the marital estate. While the property in question had the potential to produce income if used in a particular way, there was nothing to

suggest that the property had historically been income-producing. Thus, the court did not abuse its discretion by declining to impute such income to Jenea at this stage.

## X. Evidentiary Issues

¶91    Finally, Shaun challenges several evidentiary rulings made by the district court. First, he argues that the district court improperly admitted Townsend's report and the report of two of Jenea's experts in violation of hearsay rules. Second, he argues that the district court allowed Jenea to present direct evidence through undisclosed witnesses whose testimony was supposed to be limited to impeachment. But Shaun's arguments on these points are inadequately briefed.

¶92    "When we determine that a trial court erred" in admitting evidence, "we do not reverse unless there is a reasonable likelihood that a different result would have been reached absent the errors, or, in other words, we do not reverse unless the aggrieved party was prejudiced." *Johansen v. Johansen*, 2021 UT App 130, ¶ 20, 504 P.3d 152 (quotation simplified).

¶93    With respect to his hearsay argument, Shaun makes no attempt to explain how any specific result in this case would have been different without the expert reports. Instead, he merely states that "the trial court relied extensively on" the reports and then provides us with a string of page references to portions of the district court's decision. This is inadequate for Shaun to carry his burden of persuasion on appeal. *See Dahl v. Dahl*, 2015 UT 79, ¶ 67, 459 P.3d 276 (citing our oft-repeated rule that "appellate courts are not a depository in which a party may dump the burden of argument and research" (quotation simplified)).

¶94    In his discussion of the testimony from undisclosed witnesses, Shaun asserts that "[t]he trial court . . . relied on evidence from [the impeachment] witnesses to make material findings (including the findings regarding goodwill)." This

provides us with slightly more argument than the hearsay discussion, in that it at least identifies one specific issue—goodwill—that Shaun believes would have come out differently without the challenged testimony. However, Shaun does nothing to develop his argument beyond this single line of text. In relation to the goodwill question, the relevant testimony is Smith's and the vice president's statements about whether other individuals besides Shaun were involved in obtaining consulting contracts. But Shaun makes no attempt to explain why this specific testimony was not appropriate impeachment testimony, nor does he explain how the outcome of the goodwill issue would have been different in the absence of the testimony, particularly given that Shaun also testified that the president and vice president played at least some role in securing clients.

¶95    Without further development of his arguments regarding these evidentiary issues—particularly concerning the prejudice he suffered as a result of the allegedly erroneous rulings—Shaun cannot carry his burden of persuasion on appeal. Accordingly, we do not consider these arguments further.

CONCLUSION

¶96    Although we are not convinced that substantially adopting Jenea's findings of fact and conclusions of law was the best or most careful method of resolving the issues in this case, the district court did not exceed its discretion in doing so where its views on the issues aligned with Jenea's proposal and its findings of fact were sufficiently detailed and supported by the evidence. Moreover, the district court did not exceed its discretion in valuing the marital estate as of the time of trial, in calculating the value of the marital assets, or in dividing them. In assessing Jenea's need for alimony purposes, the district court's finding that she needed $300 per month to pay adult child expenses was not supported by the evidence. Additionally, the district court exceeded its discretion by including a monthly amount for

attorney fees in its calculation of Jenea's needs. The district court's remaining findings regarding Jenea's needs were supported by the evidence, and the court acted within its discretion in declining to impute additional income to Jenea based on what she might earn through investing her share of the marital estate. Finally, we conclude that Shaun's challenges to the court's rulings on various evidentiary issues were inadequately briefed.

¶97    Based on these conclusions, we remand this case for the district court to decrease Jenea's alimony award by $3,800 per month. The district court should also consider whether its ruling denying Jenea's request for attorney fees was affected by its inclusion of attorney fees in its calculation of Jenea's need. If so, the district court may elect to revisit its ruling regarding attorney fees. We otherwise affirm the district court's decision.

———————